**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**Robert H. ENGLISH and Robert V. Hudson, co-partners, doing business as English Oil Service, Defendants.**

**Civ. A. No. W–3081.**

United States District Court
D. Kansas.

April 29, 1965.

Harper Barnes, Regional Atty., Dept. of Labor, Kansas City, Mo., John Weiss, Deputy Regional Atty., Charles Donahue, Sol., T. A. Housh, Jr., Atty., Dept. of Labor, Kansas City, Mo., and Newwell A. George, U. S. Atty., Topeka, Kan., for plaintiff.

Clifford L. Malone, Wichita, Kan., and Evart Garvin, St. John, Kan., for defendants.

WESLEY E. BROWN, District Judge.

This was a suit tried to the Court, in which the Secretary of Labor seeks permanent injunctions against defendants to prevent future violations of the record keeping and overtime pay requirements of the Fair Labor Standards Act. The Secretary also seeks to restrain defendants from the withholding of amounts of overtime compensation allegedly due certain employees. Defendants contend their employees are not covered by the Act and alternatively that they are exempt as a retail and service establishment under 29 U.S.C.A. § 213(a) (2) [hereinafter referred to as 13(a) (2)].

The facts are generally not in dispute.

Plaintiff investigated defendants' wage and hour practices in 1955 and found defendants' employees exempt under 13(b) (1) because defendants at that time were engaged primarily in the hauling of crude oil. Plaintiff investigated defendants again in 1957 and again found defendants' employees exempt under 13 (b) (1).

Thereafter, defendants lost their primary crude hauling contract, though one or two drivers continue to haul some crude. Those employees are not involved in this litigation.

In 1963, plaintiff again investigated defendants' wage and hour practices. By this time, defendants' primary activity was servicing producing oil leases in the general vicinity of St. John, Kansas.

Defendants' employees primary duties included the hauling away and disposing of salt water from producing oil wells; the hauling away and disposing of basic sediment (BS) from oil storage tanks on producing leases; and the mowing of weeds around well sites. Occasionally, the BS would be laid on oil lease service roads, as it possesses some water proofing properties. Occasionally defendants' employees would haul fresh water or crude to a well to be used in servicing the well in some way or for fracture processes carried out by other companies such as Haliburton. Occasionally, defendants' employees would haul fresh water to farmers or stockmen in the area; clean septic tanks of residents of the area; clean sewer lines for the city of St. John; haul fresh water for the county commissioners—used in work on county roads. The hauling of water for individual residents and the cleaning of sewers and septic tanks constituted a minor portion of the work of defendants' employees. It is undisputed that at least 80 per cent of the work performed by defendants' employees was performed in connection with producing oil leases.

If plaintiff is entitled to recover, the parties have agreed to the amounts of past due overtime due the five employees involved and have agreed that the statute of limitations bars recovery for anything prior to January 15, 1962.

During the investigation of October 1963, it became apparent that the weekly summary payroll sheets maintained by defendants were incorrectly kept (Plaintiff's Exhibit 10 series) [this presupposes coverage under the Act]. This is admitted by defendants. The hours turned in by defendants' employees on the daily time logs (Plaintiff's Exhibit 11) were reduced by one-third before being entered on Plaintiff's Exhibit 10. The appearance from Plaintiff's Exhibit 10 was that defendants' employees were receiving time and a half overtime compensation for all hours worked in excess

of 40 hours per week. In fact, the employees were paid straight time for all hours worked. This is admitted.

The practice above described was instituted by Mr. Thompson, the manager of English Oil Service and was unknown to Mr. English at the time. Mr. English is the active partner of the enterprise, though he does not concern himself with active management of the business. Mr. Hudson, the other partner of the business takes no part in its management at all.

Since the 1963 investigation, defendants have correctly kept the time and pay records (Defendants' Exhibit D) and have paid their employees time and a half for all hours in excess of 40 hours per week.

During the time period involved some of the crude produced from leases on which defendants' employees worked entered the Arapahoe pipeline. All such Arapahoe crude was transported outside the state of Kansas. This is admitted. Some of the crude from the leases involved passed through pipes to the Skelly Refinery in El Dorado (Kansas) where it was processed and much of the refined product passed out of the state in interstate commerce. This is admitted. The facts as to what became of the crude produced on the leases on which defendants' employees worked are fully developed in stipulations or admissions or answers to interrogatories encompassed in Plaintiff's Exhibits 1 through 9. Those facts are herein incorporated.

### COVERAGE UNDER THE ACT

Plaintiff seeks to establish coverage on the ground that defendants' employees are in a closely related process or occupation directly essential to the production of goods (oil) for commerce.

Defendants' expert witness, Mr. Brown, who possesses some experience in the marketing of oil products and considerable experience in the production end of the oil industry, stated that the service provided by defendants' employees is a necessary aspect of the production of oil. The salt water and BS which accumulate are essentially waste products and must be disposed of. Where economically feasible, oil producers dispose of their own salt water in their own disposal wells; otherwise, persons such as defendants are hired to do the work. The salt water must be disposed of in a specified manner, and salt water and BS are basic by-products of the production of oil.

 There is no doubt that the oil here involved is produced for interstate commerce. And we hold that the services performed by defendants' employees is essential and necessary to that production. Accordingly, defendants' employees are engaged in a closely related process or occupation directly essential to the production of goods (oil) for commerce.

Coverage under the Act is established.

### THE 13(a) (2) EXEMPTION

13(a) (2) provides that the provisions of Sections 6 and 7 of the Act shall not apply with respect to

"(2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the state in which the establishment is located, * * *."

A "retail or service establishment" is defined as "an establishment 75 per centum of whose annual dollar volume of sales of goods or services is not for resale and is recognized as retail sales or services in the particular industry."

 The 13(a) (2) exemption is to be narrowly construed against the employer seeking to assert it and its application limited to those establishments plainly and unmistakably within its terms and spirits. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 373 (1960); Mitchell v. Kentucky Finance Company, 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959). Defendants' evidence, in our opinion, does not meet this burden and establish a right to such exemption.

 The applicability of the 13(a) (2) exemption to defendants is the main issue in this lawsuit. We are satisfied from a study of the Act, its history, and

judicial and Administrative interpretations of 13(a) (2), that "retail or service establishment" is to be treated as a single term.

The present controversy centers around the import of the 1949 amendment to 13(a) (2) which added the definition of "retail or service establishment." The Secretary asserts that to be exempted, defendants must be engaged in an activity which is "retail" by traditional concepts, while defendants argue they are exempt on a showing that their activities are considered as "retail" in the particular industry.

Defendants' expert was from the oil industry and testified he considers defendants' activities as retail sales or services and that the activities are so considered in the oil and gas industry. Plaintiff's expert was a professor of marketing from the University of Kansas School of Business. He testified that under traditional concepts, defendants' activities could not be considered retail. Plaintiff's expert admitted he was not an expert in the oil and gas field or industry.

We must begin from the basic position that Congress by the 1949 amendment did not intend

"to broaden the fields of business enterprise to which the exemption [13(a) (2)] would apply. Rather, it was time and again made plain that the amendment was intended to change the prior law *only* by making it possible for business enterprises *otherwise eligible under existing concepts* to achieve exemption even though more than 25 percent of their sales were to other than private individuals for personal consumption [the old 'business use' test], *provided* those sales were not for resale and were recognized in the field or industry involved as retail." Mitchell v. Kentucky Finance Co., 359 U.S. 290, 294, 79 S.Ct. 756, 759, 3 L.Ed.2d 815, 818 (1959) (emphasis added).

The basic philosophy of 13(a) (2) remained the same: To exempt establishments which are traditionally regarded as retail. See, e. g., Mitchell v. Kentucky Finance Co., supra, 359 U.S. at 294, 79 S.Ct. at 759, 3 L.Ed.2d at 818 n. 5. The main purpose of the 1949 amendment was to abrogate the "business use" test by which exemptions had been denied to otherwise eligible concerns where most of the sales or services of an establishment flowed to business customers rather than to private persons to satisfy personal wants. See the Kentucky Finance case supra.

Thus the applicability to the case at bar of the 13(a) (2) exemption after 1949 and as interpreted by the Supreme Court is this:

■ *If* defendants' activities are considered retail under traditional concepts, they (defendants) are not barred from the 13(a) (2) exemption merely because most of their customers are businesses and not individuals *provided* such sales or services were not for resale and were recognized as retail sales or services in the particular industry (oil and gas industry).

In other words, the initial inquiry remains: Are the activities of defendants traditionally considered "retail." *Only if* such inquiry is answered in the affirmative, do we reach the question of whether defendants' sales or services to business or commercial customers are considered as retail in the particular industry. If the initial inquiry is answered in the negative, the exemption is simply not established. As we understand the Kentucky Finance case, the "business use" test is no longer available in determining the initial inquiry set forth above. Therefore that portion of Dr. Saunders' [plaintiff's expert] testimony concerning the "business use" test is disregarded. We note that the "business use" test was only one of several tests utilized by Dr. Saunders in determining his opinion that defendants' activities cannot be considered as "retail" in any traditional sense.

Defendants rely heavily on Wirtz v. Modern Trashmoval, Inc., 323 F.2d 451 (4th Cir. 1963), cert. denied, 377 U.S. 925, 84 S.Ct. 1222, 12 L.Ed.2d 216 (1964). There the Fourth Circuit held that es-

tablishments engaged in the trash removal industry were not covered by the Act. As an alternative holding, the court ruled that the trash haulers were exempted under 13(a) (2).

We are of the opinion that the Fourth Circuit in Trashmoval used essentially the same standards or inquiries which we mentioned above. The court there first determined, under general criteria or traditional concepts (excluding the "business use" test) that the activities of the trash haulers were typical retail. ("In determining whether or not a business activity is a 'retail or service establishment' * * * we think the most satisfactory approach is to examine the facts of record as to the nature and conduct of its business in the light of *general criteria* developed under the Act since its enactment in 1938." 323 F.2d at 465 (emphasis added).

Having answered that initial inquiry in the affirmative, the Fourth Circuit next determined that the activities of the trash haulers were recognized as retail in the trash hauling industry. This was necessary because a large portion of the trash haulers' customers were business concerns and not individuals. We shall utilize the same general characteristics of retail or service establishments as used in Trashmoval (323 F.2d at 466) in determining whether defendants' activities are traditionally "retail."

(a) Typically a retail or service establishment is one which sells its goods or services to the general public.

Though the bulk of defendants' services were sold to a particular specialized segment of the public, the testimony was and it is so found that it was offered to the public at large and some services were rendered to customers of the public at large.

(b) The retail or service establishment serves the every day needs of the community in which it is located.

English Oil Service met the everyday needs of the community of oil producers by hauling and disposing of salt water and BS—and on occasion of the community of St. John by cleaning its sewers and the septic tanks of its residents.

(c) Defendants' service was offered in a limited geographical area in the center of Kansas at uniform rates with no discounts to particular customers.

(d) There was no requirement that customers utilize defendants' service regularly or in a minimum quantity other than the minimum charge for hauling water ($6.00 per hour—two hour minimum).

(e) A retail or service establishment performs a function in the business organization of the nation which is at the very end of the stream of distribution, disposing in small quantities of the products of such business organization.

Sub-paragraph (e) above is the key to the case at bar. The facts at bar place defendants at the opposite end of the stream of distribution from the trash haulers.

Since at least 80% of defendants' services were sold to oil producers, the business organization to be considered is the oil industry. The end of the stream of distribution of the oil industry is far from the oil fields and far from the refineries. Defendants' activities are concentrated in the producing end of the economic chain and not at the consumption end.

In terms of Mr. Brown and Dr. Saunders' testimony, defendants' activities occur in the production aspects of the industry; therefore defendants' services are rendered in the concentration phase of economic activity as opposed to the dispersion phase of economic activity. In contrast, trash haulers perform their services at the very end of the dispersion phase or at the very end of the line of distribution.

Additionally, Dr. Saunders testified that activities similar to those of defendants were classified as industrial rather than retail in the Standard Industrial Classification Manual, a publication distributed by the Bureau of the Budget and which attempts to classify in accordance with industry practices. It is

true that Dr. Saunders relied in part on the "business use" test in classifying English Oil Service as traditionally non-retail. As indicated above, the "business use" test was abrogated by the 1949 amendment to 13(a) (2).

We are satisfied that Dr. Saunders' use of the "business use" test was not an integral part of his reasoning on which his opinion was based. We do not feel that Dr. Saunders' opinion should be disregarded merely because the "business use" test was utilized along with several other tests.

We conclude that the activities of defendant are not typically or traditionally retail.

Since we do not consider defendants' services as essentially retail, we do not reach the secondary inquiries of 13(a) (2), though we note that defendants' sales or services were essentially all made within the state and that defendants' services were not for resale, though the cost of such services do become a part of the total costs of oil production. Obviously the service of hauling salt water is not for resale. We note further that defendants' services are considered "retail" within the oil industry.

The basis of our conclusion that defendants are not exempt under 13(a) (2) is that defendants' activities are not typically or traditionally retail and thus not "retail" as contemplated by 13(a) (2).

Having determined that defendants' employees are covered by the Act and not exempted by 13(a) (2), it follows that record-keeping and overtime compensation violations have occurred.

We feel that plaintiff has shown good cause to be entitled to some injunctive relief. We desire additional information prior to a determination of the nature and extent of such an injunction.

### THE INJUNCTION ISSUE

Defendants contend it is necessary for plaintiff to obtain the written consent of the employees for whom back pay claimed to have been illegally withheld under § 17 of the Act are sought. The former wording of 29 U.S.C.A. § 217 [§ 17] provided that no court shall have jurisdiction, and any action brought by the Secretary to restrain violations of the Act, to order the payment to employees of unpaid overtime or an additional equal amount as liquidated damages.

The present wording of § 17, however, provides that federal court shall have jurisdiction for cause shown to restrain violations to the Act, "including * * the restraint of any withholding of payment of * * * overtime compensation found by the court to be due. * *."

The congressmen who passed the 1961 amendment to § 17 noted that under the old provision, the Secretary had no authority to require payment of overtime due except where an employee requested an action to be brought by the Secretary. And congressmen indicated that the amendment would establish a more effective method of enforcing an employee's rights. The Secretary's remedy under § 17 does not extend to the allowance of liquidated damages, we note. See 1961 Congress and Administrative News, pp. 1658, 1659. See also Jones v. American Window Cleaning Corp., D.C., 210 F. Supp. 921 (E.D.Va.1962).

Defendants also argue that the provisions of § 17 of the Act providing for an injunction to restrain the withholding of payment of past due wages is unconstitutional. No authorities have been cited to us and we have found none to indicate that § 17 is unconstitutional. The presumption of the constitutionality of congressional acts leads us to conclude that if defendants cannot supply some authority or reason to the contrary, we will consider this contention to be without merit.

The foregoing Memorandum embodies the findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a), believed by the court to be necessary with respect to coverage under the Act. We will hear additional evidence, if necessary, and arguments on the question of injunctive relief at 9:30 o'clock A.M., 11th day of May, 1965 or as soon thereafter as the matter may be heard.