**George P. SHULTZ, Secretary of Labor, United States Department of Labor, Plaintiff,**

**v.**

**William P. MORRIS and Warren G. Morris, Individually, and William P. Morris and Warren G. Morris comprising a partnership, Defendants.**

**Civ. A. No. 2924.**

United States District Court, M. D. Alabama, N. D.

June 22, 1970.

---

L. H. Silberman, Solicitor of Labor, Washington, D. C., Beverley R. Worrell, Regional Solicitor and Roger J. Martinson, Attorney, U. S. Department of Labor, Atlanta, Ga., for plaintiff.

W. H. Albritton, Albrittons & Rankin, Andalusia, Ala., and James W. Kelly, Geneva, Ala., for defendants.

## OPINION AND ORDER

FRANK M. JOHNSON, Jr., Chief Judge.

This action was brought by the Secretary of Labor under the provisions of Section 17 of the Fair Labor Standards Act, 29 U.S.C.A. § 217, to enjoin the defendants (who are employers) from violating the provisions of Sec. 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act and to restrain them from withholding payment of minimum wages and overtime compensation due certain employees. The case is, by agreement of the parties, submitted upon a written stipulation of facts and their briefs and arguments.

The Secretary is proceeding on an enterprise theory of coverage (Section 3 (r)) since there are three physically separate retail grocery stores involved. Two of the stores are owned and operated by William P. Morris and the third is owned and operated by a partnership composed of William (75%) and Warren G. Morris (25%). Warren manages the partnership store which is located in Brundidge, Alabama. The other two stores are located in Clayton and Hartford, Alabama. No one of the stores had a gross volume of sales equal to $1,000,000 during the time in question. However, since 1968 the three stores combined have grossed over $1,000,000 and since 1967 the two William Morris stores grossed together more than $500,-000.

The Secretary contends that the three stores constitute an "enterprise" engaged in commerce or in the production of goods for commerce and was covered by the 1961 amendments to the Fair Labor Standards Act once the combined annual gross sales exceeded one million dollars.

The defendants contend (1) that the stores did not constitute an "enterprise" within the meaning of the Act, (2) that, even if they did, the "enterprise" is not subject to the 1961 amendments because the 1966 amendments provide a transitory period and minimum rates and maximum hours for "newly covered" enterprises, and (3) that in any case the defendants relied on the advice and assistance of a Ben Bruner who was engaged in the business of assisting employers in compliance with the Fair Labor Standards Act, wherefore their good faith should prevent the issuance of an injunction.

There are three basic questions presented in this case.

I

The first question this Court must decide is: Do the three stores constitute an "enterprise" within the meaning of Section 3(r)?

Section 3(r) of the Act provides:

"Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor; *Provided,* That, within the meaning of this subsection, a retail or service establishment which is under independent ownership shall not be deemed to be so operated or controlled as to be other than a separate and distinct enterprise by reason of any arrangement, which includes, but is not necessarily limited to, an agreement (1) that it will sell, or sell only, certain goods specified by a particular manufacturer, distributor, or advertiser, or (2) that it will join with other such establishments in the same industry for the purpose of collective purchasing, or (3) that it will have the exclusive right to sell the goods or use the brand name of a manufacturer, distributor, or advertiser within a specified area, or by reason of the fact that it occupies premises leased to it by a person who also leases premises to other retail or service establishments.

There are three elements to be considered: *related activities, common control or unified operation* and *common business purpose.* Wirtz v. Savannah Bank & Trust Co. of Savannah, 362 F.2d 857, 859 (5th Cir. 1966).

There can be no doubt that the activities of these three stores are related because they all are retail grocery stores. The Senate Report on the definition of "enterprise" makes this clear:

Within the meaning of this term, activities are "related" when they are the

same or similar, such as those of the individual retail or service stores in a chain, or departments of an establishment operated through leasing arrangements. [S.Rep. No. 145, 87 Cong., 1st Sess. 31 (1961), U.S.Code Congressional and Administrative News 1961, p. 1620]

In 1966, commenting on the new amendments, the Senate Report reiterated this meaning of "related activities":

> Also, the operations through substantial ownership or control of a number of firms engaged in similar types of business activities constitute, in the committee's view, related activities performed through unified operation or common control within the meaning of the definition of enterprise. The fact that the firms are independently incorporated or physically separate or under the immediate direction of local management, as in Wirtz v. Hardin, 16 Wage Hour Cases 722 (N.D.Ala.), is not determinative of this question. [S.Rep. No. 1487, U.S.Code Congressional and Administrative News, 1966, p. 3009]

It should be emphasized that the defendants in the instant case rely on Wirtz v. Hardin & Co., 253 F.Supp. 579 (N.D.Ala.1964), aff'd per curiam, 359 F.2d 792 (5 Cir., 1966). Ordinarily, the post hoc expression of disapproval in a committee report is not given much weight when the language does not construe any statutory language that is being altered by the reported bill. The 1966 amendments did not change the "related activities" language and the report's disapproval was in effect "dicta". Nevertheless, the Fifth Circuit has indicated its agreement with the Senate Committee's repudiation of Wirtz v. Hardin. Shultz v. Mack Farland & Sons Roofing Co., 413 F.2d 1296 (1969). In Wirtz v. Hardin the district court had found that six Piggly Wiggly stores did not constitute an "enterprise" because there was no centralized management and control, the operation of the stores was not unified and each of the local managers had substantial investments in the stores they operated. For the several reasons hereinafter appearing, this case, even if it had not been repudiated, is not factually applicable.

 There is no doubt but that the three stores here are being operated for a common business purpose. The ultimate purpose of the three stores is to make a profit. All of the net profit from the Clayton and Hartford stores goes to William Morris and 75% of the net profit from the Brundidge (partnership) store goes to William Morris. The Fifth Circuit has held that the profit motive is a common business purpose if shared. Wirtz v. Savannah Bank & Trust Co. of Savannah, 362 F.2d 857, 861 (1966):

> * * * [A] common business purpose is found in the [bank's] operation of the office building to enable the Bank to locate in a desirable downtown area, to provide space for future expansion, *to improve the Bank's profit position,* both from the standpoint of revenue and taxes, and to strengthen the image of the Bank in the public eye. [Emphasis supplied.]

Of course, the mere fact that someone shares in the profits from a group of business entities is not enough to make them an enterprise for the purposes of the Act. The *Savannah Bank* case indicates that there must be other factors in addition to a common profit motive. In the instant case there are other common factors. The stipulation states that the three stores pay license fees to Piggly Wiggly on the combined volume of all three stores; there is one Piggly Wiggly franchise for all three stores— issued in the name of William P. Morris. William Morris owns the buildings in which the Hartford store and the Brundidge (partnership) store are located and rents the building in which the Clayton store operates. The partnership rents the Brundidge building for $650 monthly.

The last and most difficult question is whether the three stores were under either unified operation or common control. This Court now finds that they were under common control. It is conceded that the two stores in Clayton and Hartford constitute an enterprise. The issue is whether the partnership store can be added to them to make an enterprise with total annual gross sales in excess of $1,000,000.

The following incidents of common control are set out in the stipulation:

(1) All invoices were handled in and paid from Hartford by checks drawn by William from the bank accounts (in separate banks) of each store.

(2) The bookkeeper at the Hartford store keeps the books for all three stores, although she keeps a separate set for each store.

(3) The partnership and individually owned stores operate under one Piggly Wiggly franchise and pay franchise fees on a volume discount basis with the combined volume of the three stores considered as the total volume for the single franchise.

(4) William owned the buildings in which the Hartford and partnership stores were located. He rented the building for the Clayton store. The partnership paid a monthly rental of $650 for the Brundidge store.

(5) Both William and Warren used the services of the same man for advice on the Fair Labor Standards Act—a Mr. Ben Bruner. All three stores followed the same wage and hour practices.

(6) William is a 75% partner in the Brundidge store and Warren is a 25% partner. The Brundidge store was established after the other two stores had been in operation for some time.

(7) All three stores deal with the same out-of-state meat supplier.

(8) The Piggly Wiggly franchise is in the name of William P. Morris for each of the stores.

The following incidents of separate control and operation are set out in the stipulation:

(1) The partnership store has a separate sales tax number and Federal Employer Identification Number from the two individually-owned stores.

(2) Warren manages the partnership store and makes all the day-to-day decisions. He signs the salary checks for the employees in the Brundidge store and pays the wages. Warren has no interest in the two other stores.

(3) The partnership maintains separate books, a separate bank account, and makes its own separate tax return.

(4) There is no formal agreement between Warren and William involving the operation of the stores.

(5) Each store had its own policy on sale prices and purchasing.

(6) There was no group purchasing or warehousing. (It might be pointed out that there was no warehousing at all.)

(7) The stores purchased trading stamps separately.

(8) The stores purchased their inventories separately.

The defendants argue that there was no common control because under Alabama law each partner, regardless of the amount of money he has invested in the partnership, has an equal voice in the affairs of the partnership. It is urged that "shared control" is not control. Regardless of the legal position of partners, this Court cannot ignore the reality that a 75% partner is more "equal" than a 25% partner, particularly when the dominant partner was in the grocery business before the inferior partnership was set up. It is hard to believe that Warren would fail to follow any strongly felt wishes of William, who holds the franchise and has 75% of the investment in the partnership.

The crucial factor in this case is the fact that the three stores operate under

one franchise in one name and their volume discount is figured on the basis of the total sales of all three stores. If the stores deal with Piggly Wiggly as one enterprise—and they do—they should be required to deal with their employees and the Secretary of Labor as one enterprise.

■ The test is not the day-to-day control of the stores but whether there is a *common control center* with the ultimate power to make binding decisions for all the units of the enterprise. " 'Common control' may exist, as it [does] here, despite the separate management of the individual establishments." Shultz v. Mack Farland & Sons Roofing Co., *supra*, 413 F.2d at 1301. The fact that one man has the dominant equity position in the three stores is highly significant. As the court stated in *Mack Farland*: "Here, McFarland put up all the capital for both corporations. Money talks. It talked through McFarland who ran the corporations as his venture into the roofing business in Broward County."

The instant case is very like the Piggly Wiggly chain in Wirtz v. Barnes Grocer Company, 398 F.2d 718 (8th Cir. 1968), although that case is not completely on point because the stores were incorporated and 99.51% of the shares were held by one family. Other aspects of the cases do coincide, however. Both cases involved a single Piggly Wiggly franchise for several retail stores, with a combined volume discount. Each store had a manager with authority to hire and fire, select the type and quantity of goods and set the prices at which they were sold. There was a centralized bookkeeping and check-writing procedure although the stores filed separate income tax returns. There is the same common ownership of the buildings in both cases. The Eighth Circuit also rejected Wirtz v. Hardin, preferring to rely on West v. Wal-Mart, Inc., 264 F. Supp. 158 (W.D.Ark.1967). *Wal-Mart* involved a chain of discount stores which

were separately incorporated but under common control because one man and his family owned a majority interest in each of the three stores.

■ "We start with the proposition that the Act should be liberally construed." Shultz v. Mack Farland, *supra* 413 F.2d at 1300. On this point it is now concluded that the Secretary has met his burden of proof that the three stores are an enterprise within the meaning of Section 3(r) of the Fair Labor Standards Act.

■ The Secretary must also prove, however, that the "enterprise" was "engaged in commerce or in the production of goods for commerce". The 1961 amendments defined these terms to mean:

* * * any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person:

(1) any such enterprise which has one or more retail or service establishments if the annual gross volume of sales of such enterprise is not less than $1,000,000, exclusive of excise taxes at the retail level which are separately stated *and if such enterprise purchases or receives goods for resale that move or have moved across state lines (not in deliveries from the reselling establishment) which amount in total volume of $250,000 or more;* * * *. [Emphasis added.]

The stipulation establishes that if the three stores are considered together the two requirements are met.

## II

Does the transition scheme provided in the 1966 amendments exclude the defendants from the requirements of the 1961 amendments?

The 1966 amendments decreased the $1,000,000 requirement to $500,000 for

the period from February 1, 1967, to January 31, 1969, and $250,000 thereafter, but provided for a transition period during which newly covered employees would be entitled to wages set on a scale that only gradually approached the $1.40 and $1.60 requirement. 29 U.S.C.A. §§ 203, 206.

The defendants had gross sales in excess of $500,000 per year when the 1966 amendments became effective—February 1, 1967. As a result they were covered by the new minimum wages and on the advice of a wage and hour adviser all three stores began paying their employees the new minimum wages—$1.00 an hour for the first year, $1.15 the second year and so forth. The defendants' employees who were themselves in commerce within the meaning of the Act were paid the new $1.40 and later the $1.60 minimum.[1]

Sometime during 1967 the combined gross sales of the three stores exceeded the rate of $1,000,000 per year. The question is whether the fact that the stores were operating under the transition scheme before they reached the $1,000,000 mark insulates them from the higher wage scales. The wage and hour adviser advised the defendants that they were indeed insulated.

The 1966 amendments provide in Section 303:

> Section 6 * * * (b) Every employer * * * who in such workweek is brought within the purview of this section by the amendments made to this Act by the Fair Labor Standards Amendments of 1966, wages at the following rates: * * *. [29 U.S.C. § 206]

Section 207(a) (2), the overtime provision, uses identical language. Thus, this issue is whether the language should be read "Every employer who in such workweek is brought within the purview of this section *solely* by the amendments made" in 1966 or "Every employer who in such workweek is brought within the purview of this section by the amendments made to this chapter by the 1966 amendments even if he is also brought within the coverage of the Act for some other reason."

The language of the section is much more favorable to the first, the Secretary's position. The Fifth Circuit has so construed the statute:

> The Fair Labor Standards Amendments of 1966 (80 Stat. 830), which became effective February 1, 1967, eliminated the dollar volume test for coverage of enterprises engaged in the business of construction or reconstruction. Employers who became subject to the Act solely because of such Amendments were required to pay the statutory overtime premium only after 44 hours a week during the period February 1, 1967, to January 31, 1968 (Section 7(a) (2) ).

Shultz v. Mack Farland & Sons Roofing Co., 413 F.2d 1296, 1298 (1969).

The CCH Labor Law Reporter also construed the amendments the same way:

> Coverage must be solely by reason of these amendments in order for the lower interim rates to apply; otherwise the higher standards for those employees who are covered under prior tests must be met.

CCH Labor Law Reporter, 2 Wages Hours at p. 39,111.

> The lower interim rates also apply whenever enterprise coverage results from the elimination of monetary tests formerly required for enterprise coverage. However, whenever an employer meets the former $1 million test, and in the case of retailers, the former requirement that they purchase $250,000 worth of interstate goods yearly, the temporarily higher minimum wage standards at 25,404 apply.

*Id.* at p. 39,112.

Although a CCH reporter is not binding authority, it does indicate that there

---

1. We are concerned here only with the employees who are covered only because the enterprise for which they work is covered.

was very little doubt in anyone's mind about the meaning of the statutory language.

■ There is no policy reason for extending the transition scheme to employers in the defendants' position. The purpose of the transition scheme was to afford some relief to those enterprises which were of a type not heretofore covered. The amendments would affect enterprises of a size which had not been covered before. Businessmen were given a grace period in which to adjust to the new higher requirements. But someone who knew that once he reached a certain size he would be required to pay the minimum wage and overtime after 40 hours did not need a grace period. Employers have known since 1961 that once they reached a certain volume they would be held to a higher wage schedule. There was no change, detrimental reliance or surprise.

■ One of Congress's policies in enacting the Fair Labor Standards Act was to treat similar businesses alike. All businesses over $1,000,000 are required to pay the same minimum wages, regardless of when they grew to have such annual gross sales. A business which reached the $1,000,000 level after the 1966 amendments, if defendants' construction is sound, would have a competitive advantage over its older competitors because its labor costs would be lower. The point in time at which the competitors achieved the million dollar mark is the only difference between them; this difference is not sufficient to justify granting the latecomer such a competitive advantage.

### III

Is the Secretary entitled to an injunction requiring that the defendants pay their employees their back wages?

The defendants argue that an injunction should not issue because the defendants acted in good faith, pursuant to advice, and there is no question about future compliance. They argue that the issue here was a truly novel question of law which they had the bad luck to guess wrong on.

The cases on which the defendants rely all pertain to the denial of injunctions against further violations. What the Secretary seeks here is an order requiring the defendants to pay accrued back wages—i. e., to remedy a past wrong. There is an unbroken line of appellate cases requiring the issuance of injunctions in such cases, even when the court has permitted the district court to decline to issue a prospective injunction. The Fifth Circuit has declined to hold that there are no circumstances in which an order requiring the employer to pay back wages and overtime would be denied, Shultz v. Parke, 413 F.2d 1364, 1370 (1969), but it has found for the Secretary in every case this Court finds it has decided on this point. Even district court judges who are reluctant to issue prospective injunctions against good faith employers have issued the remedial order. See, e. g., Wirtz v. Ray Smith Transport Company, 280 F.Supp. 54, 59 (E.D.Tex.1968); Wirtz v. Hartley's, Inc., 245 F.Supp. 101, 107 (S.D.Fla. 1965).

■ The ignorance, good faith or reliance on the advice of counsel of the employer is not a defense to the Secretary's suit for an order restraining the withholding of back wages and overtime pay. Even if it were, this is not such a case. The defendants should have known that they were covered by the 1961 amendments. For example, the employers were issued, upon application, "Certificates Authorizing Special Minimum Wages for Full Time Students in a Retail or Service Etablishment" by the Department of Labor. Typed in at the bottom of each of the certificates is the following:

SPECIAL NOTE: The rates in item 5 are amended to $1.36 an hour when your enterprise's annual dollar volume of business done becomes $1 million or more.[2]

---

2. See exhibits H, I and J.

This should have put the defendants on notice that the Department of Labor construed the language in the 1966 amendments as not creating a grace period for enterprises reaching the $1,000,000 level after February 1, 1967. The certificates do not have a date of issuance, but they became effective November 26, 1968. Therefore, they must have been issued prior to November 26, 1968.

Less unambiguous, but still indicative of the Secretary's construction, is the "Notice to Employees", WHPC Publication 1175, required to be posted by employers and included with the stipulation as Exhibit A. The notice is not entirely clear; it reads, in relevant part, as follows:

> These rates must be paid to all employees, not specifically exempt, whose employment would, under the Act's definitions before February 1, 1967, constitute engaging in commerce or in the production of goods for commerce or employment in an enterprise in commerce or in the production of goods for commerce, and to whom no exemption from such requirements was applicable prior to such date.

The most elaborate and best discussion of the question of the mandatory nature *vel non* of a remedial injunction appears in Wirtz v. Malthor, Inc., 391 F.2d 1 (9th Cir. 1968). The Court of Appeals reversed the district court's denial of a remedial injunction holding that the reasons given by the lower court were inadequate. They were the employer's good faith, the fact that the violation was not willful, that the business was small and ordering payment of the back wages might prove a hardship for it, and that the public interest was well enough protected by the injunction against future violations.

The Court of Appeals reasoned that "restraining appellees from withholding the minimum wages and overtime compensation is meant to vindicate a public, rather than a private, right, and that the withholding of the money due is considered a 'continuing public offense.' Wirtz v. Jones, 340 F.2d 901 (5th Cir. 1965); Burk Builders, Inc. v. Wirtz, *supra* [5 Cir., 355 F.2d 451]; Wirtz v. English, *supra* [D.C., 245 F.Supp. 628]." The Fifth Circuit has adopted the continuing public offense theory. Shultz v. Mack Farland Roofing Co., *supra*; Wirtz v. Jones, *supra*. The Ninth Circuit found two purposes for the section authorizing the Secretary to seek a restraint against withholding back wages.

> First, the restraint was meant to increase the effectiveness of the enforcement of the Act by depriving the violator of any gains accruing to him through his violation. [In the instant case, the amount at stake is $19,000.] Second, the amendment was meant to protect those employers who comply with the Act from having to compete unfavorably with employers who do not comply.

Wirtz v. Malthor, *supra*. In addition, once the Secretary brings a suit under Section 17 the employee's right to enforce his claim to back wages is extinguished. 29 U.S.C.A. § 216(b). It is clear, therefore, that the District Court may not permit the employer to evade paying the amount due to employees.[3]

 Under the facts presented in this case, this Court does not find any reason for the issuance of a prospective injunction. In the first place, there was a substantial issue involving coverage and there has been, to the extent that this Court has been able to determine, on the part of the defendants a good faith quest for legal determination of that issue. In the second place, there has been no effort on the part of the defendants to thwart the investigation or to keep or present to the Secretary anything but full and complete records. Finally, it

---

3. The Fifth Circuit affirmed the issuance of a remedial injunction in Burk Builders, Inc. v. Wirtz, 355 F.2d 451 (1966), and reversed per curiam the denial of such an injunction in Wirtz v. Hines Realty Company, 361 F.2d 321 (1966), and adopted the reasoning of the Ninth Circuit (*Malthor*) in Shultz v. Mack Farland Roofing Co., 413 F.2d 1296 (1969).

does not appear that there is any probability of further violations. The Secretary's request for prospective injunction, therefore, will be denied.

In accordance with the foregoing, it is the order, judgment and decree of this Court that the defendants and each of them be and each is hereby enjoined and restrained from withholding the payment of minimum wages and overtime compensation due defendants' employees as follows:

## BRUNDIDGE PIGGLY WIGGLY

| | |
|---|---|
| Edward Burdick | $28.37 |
| Danny Byron Carter | 21.68 |
| Theodore N. Carter | 9.92 |
| Joseph Dorrell | 118.09 |
| Syble Ann Dorrill | 343.60 |
| Rickey Ellis | 241.19 |
| Elmer Gene Fleming | 18.28 |
| Carlos E. Hagler | 157.17 |
| Shirley Hatfield | 305.71 |
| Elbert Ray Justice | 414.66 |
| Ben P. Lee | 377.69 |
| Carolyn Virginia Lee | 499.80 |
| Ike Lee | 573.91 |
| Dianne Morris | 27.89 |
| Mary J. Prestwood | 147.85 |
| Paul E. Sellers | 88.24 |
| Edna Steed | 92.33 |
| Max O. Steed | 340.60 |
| Willie Ivey Steed | 243.11 |
| Frances D. Stewart | 954.38 |
| W. Kenneth Stewart | 1,254.07 |
| Kenneth Wayne Thompson | 20.36 |
| James Eddie Windham | 266.80 |
| Clyde F. Woods | 645.50 |
| | $7,191.20 |

## HARTFORD PIGGLY WIGGLY

| | |
|---|---|
| Jeter Faye Anderson | 12.87 |
| Daniel R. Booker | 18.64 |
| Larry L. Bottoms | 416.59 |
| Roger D. Bottoms | 61.76 |
| Bobbie Jean Brannon | 199.55 |
| Neva Carroll Brannon | 40.92 |
| James L. Butler (Butcher), Jr. | 347.48 |
| Mary Alice Butler | 466.07 |
| Randy K. Byrd | 365.58 |
| Raymond D. Clemmons | 807.72 |

## HARTFORD PIGGLY WIGGLY

| | |
|---|---|
| Michael L. Enfinger | 157.59 |
| Janice L. Fondern | 53.15 |
| Sharon K. Hutchenson | 152.01 |
| Sherry G. Isler | 258.60 |
| Robert William Morris | 27.22 |
| Charles L. Richards | 20.53 |
| Willa D. Robinson | 26.37 |
| Dennis M. Rogers | 334.09 |
| Donnie Roger Sanders | 235.12 |
| Paul E. Sellers | 107.34 |
| Glenda Faye Smith | 138.04 |
| Sidney Ussery | 11.71 |
| Michael L. Weeks | 329.45 |
| | $4,588.40 |

## CLAYTON PIGGLY WIGGLY

| | |
|---|---|
| Carlos Baxley | 40.94 |
| Danny Benefield | 46.12 |
| Ronnie Benefield | 412.78 |
| Paul S. Bottoms | 12.19 |
| H. Maurice Brunson | 546.11 |
| Evelyn Caraway | 135.88 |
| Beatrice B. Cooper | 225.93 |
| George M. Eaton | 187.68 |
| James R. Eusey | 147.44 |
| Mary Ellen Fenn | 11.94 |
| Bobby Joe Glover | 657.77 |
| Linda Greathouse | 42.80 |
| Carlos E. Hagler | 322.47 |
| Phillis L. Helms | 179.82 |
| Louie Hovey | 1,860.37 |
| Judy Medley Kelly | 15.76 |
| Charles E. McCall | 40.43 |
| Carlos Medley | 123.43 |
| Ronnie Parrish | 31.08 |
| Marion T. Porterfield | 62.79 |
| Donald F. Price | 851.84 |
| Sandra Price | 398.88 |
| Jeanne M. Scoggins | 760.25 |
| Doris S. Sewell | 141.14 |
| Gary Lee Stersland | 7.41 |
| Jane Teal | 84.44 |
| Joey Tew | 157.77 |
| Monty Wester | 5.88 |
| Charles A. Woods | 9.99 |
| | $7,521.33 |

It is further ordered that defendants, within 30 days from the date of this or-

der, pay to the Secretary or his authorized representative for distribution to the employees herein named the amounts hereinabove specified.

It is further ordered that the Secretary's motion to enjoin and restrain defendants from future violations of the Act be and the same is hereby denied.

It is further ordered that the costs incurred in this action be and the same are hereby taxed against the defendants.