James D. HODGSON, Secretary of Labor, United States Department of Labor

v.

EUNICE SUPERETTE, INC., a corporation, et al.

Civ. A. No. 17758.

United States District Court,
W. D. Louisiana,
Opelousas Division.

Dec. 14, 1973.

Richard F. Schubert, Sol. of Labor, U.S. Dept. of Labor, Washington, D.C., Beverley R. Worrel, and Leighton A.

Beers, Jr., Attys., U.S. Dept. of Labor, Birmingham, Ala., for plaintiff.

J. Michael Morrow, DeVillier & Ardoin, Eunice, La., for defendants.

NAUMAN S. SCOTT, District Judge:

The Secretary of Labor brought this action against the defendants to enjoin them from violating the minimum wage, overtime, and record keeping provisions of the Fair Labor Standards Act of 1938, as amended in 1961, 29 U.S.C. § 201, et seq. (hereinafter referred to as The Act), and to restrain the defendants from withholding payment of minimum wages and overtime compensation due to the defendants' employees since April 12, 1969.

It is the position of the Secretary that the defendants' operations are covered by Sections 3(r) and 3(s) of the Act, 29 U.S.C. 203(r), (s), the 1961 Enterprise Amendments.[1]

Employees of any business organization covered under these amendments to the Act must be paid the appropriate minimum wage and overtime as provided by Sections 6 and 7, 29 U.S.C. §§ 206, 207.[2]

[1]. Section 3(r) provides: " 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor . . ."

Section 3(s) of the Act, provides, in part: " 'Enterprise engaged in commerce or in the production of goods for commerce' means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person; (1) any such enterprise which has one or more retail or service establishments if the annual gross volume of sales of such enterprise is not less than $1,000,000, exclusive of excise taxes at the retail level which are separately stated and if such enterprise purchases or receives goods for resale that

move or have moved across State lines (not in deliveries from the reselling establishment) which amount in total annual volume to $250,000 or more; . . . "

[2]. Section 6 of the Fair Labor Standards Act provides, in part: "(a) Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates: (1) not less than a $1.40 a hour during the first year from the effective date of the Fair Labor Standards Amendments of 1966 and not less than $1.60 an hour thereafter, except as otherwise provided in this section . . .."

Section 7(a)(1), Maximum hours, provides: "Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek

Eunice Superette, Inc. is a closely held corporation duly organized and established under the laws of the State of Louisiana. This corporation owns and operates: (1) a retail grocery store, and (2) a predominatly wholesale slaughterhouse in Eunice, Louisiana. The grocery and the slaughterhouse are located on the same street in Eunice but are somewhat over a mile apart. The Corporation is capitalized with 1000 shares of stock; defendant, Jerome J. Moore, owns 501 shares, defendant Dennis Hollier owns 498 shares, and Hollier's wife owns the remaining 1 share. Hollier and his wife sold their 499 shares to Moore in March of 1973, but this fact bears no effect on the outcome of the present litigation.

■ The defendants are alleged to have paid certain grocery store employees at rates less than the statutory minimum for wages and overtime. The defendants argue that they were not covered by the Act until October 1970. The fulcrum of the argument between the two parties centers on whether or not the operations of the grocery store and the slaughterhouse constitute two enterprises, or a single enterprise, within in the meaning of Section 3(r) of the Fair Labor Standards Act. Under the 1961 amendments an enterprise is covered by the Act if the annual gross volume of sales of such enterprise is not less than one million dollars and the annual volume of purchased or received goods intended for resale which had moved across state lines equals or exceeds $250,000.00. The parties have stipulated that in 1968 the operations of the slaughterhouse and the grocery store combined surpassed the one million dollar inflow test and the $250,000 interstate requirement. Consequently, if this Court were to find the operations constituted a single enterprise, then coverage under the 1961 amendments would exist as of 1968. However, if we were to conclude that the grocery store and the

slaughterhouse were separate enterprises, as the defendants strenuously argue, then the grocery store would not be covered by the 1961 Amendments until September 30, 1970.

The Fifth Circuit has held that the statutory definition of "enterprise" requires the existence of three elements: (1) related activities; (2) common control or unified operation; and (3) a common business purpose. Wirtz v. Savannah Bank & Trust Co. of Savannah, 362 F.2d 857, 859 (5th Cir. 1966).

1. Related Activities. The Report of the Senate Committee on Labor and Public Welfare states:

"Within the meaning of this term, activities are 'related' when they are the same or similar, such as those of the individual retail or service stores in a chain, or departments of an establishment operated through leasing arrangements. They are also 'related' when they are auxilliary and service activities such as central office and warehousing activities and bookkeeping, auditing, purchasing, advertising, and other services. Likewise, activities are 'related' when they are part of a vertical structure such as the manufacturing, warehousing and retailing of a particular product or products under unified operation or common control for a common business purpose." S.Rep.No. 145, 87 Cong. 1st Sess. 31 (1961), U.S. Code Congressional and Administrative News, 1961, p. 1620.

Although the slaughterhouse is primarily a wholesale outlet, and the grocery store is essentially a retail outlet, the defendants have admitted, and the evidence indicates, a sizable amount of over-the-counter retail sales at the slaughterhouse. These over-the-counter sales have ranged anywhere from 30% to 45% of the total sales of the slaughterhouse in the years from 1969 thru 1972. Retail activities of the slaughterhouse included providing the consuming

longer than forty hours unless such employee receives compensation for his employment in excess of . . . the regular rate at which he is employed."

public with slaughtering and dressing services at a fixed fee. Ground beef, small cuts and also beef by the quarter and the half, could be purchased at the slaughterhouse at all times. If items such as small cuts could not be supplied at the slaughterhouse, the customer was often referred to the grocery store. The slaughterhouse provided the grocery store with easier access to wholesale meats. The grocery store and the slaughterhouse share, by right of their mutual corporate connection, a closer degree of kinship than would completely independent operations of the same kind. We find that the activities, both in the horizonal and vertical sense mentioned in Senate Report, supra, were related, Wirtz v. Barnes Grocer Co., 398 F.2d 718 (8th Cir. 1968).

2. Common Control. The defendants offer evidence that the grocery store and the slaughterhouse were entirely separate and independent: a. dealt at arms length with each other; b. the grocery store paid the same price for wholesale meat as did all the competitive buyers; c. separate employees; d. separate books; e. majority stockholder, Moore, was primarily responsible for the management and supervision of the slaughterhouse; and f. minority shareholder, Hollier, of the grocery store, Wirtz v. Modern Builders, Inc., 288 F.Supp. 338 (D.C.Ga.1968).

*Modern Builders, supra,* is solid authority for the proposition that the grocery store and the slaughterhouse are "separate *establishments*"; not "separate *enterprises*".[3] In *Modern Builders,* the issue was whether a general construction business and a retail building materials business were two separate "establishments". *Modern Builders, supra,* never entertained any questions regarding enterprise, enterprise coverage, or common control. The fact that the two major stockholders, Moore and Hollier, divide their operative responsibilities is not material to the question of common control. In Shultz v. Morris, 315 F.Supp. 558 (D.C.Ala.1970) the court found common control in the hands of William Morris, despite the fact that he had little to do with the operation of the partnership store:

> "The test is not the day-to-day control of the stores but whether there is a *common control center with the ultimate power to make binding decisions for all the units of the enterprise."* (Emphasis added).

There was common control in Eunice Superette, Wirtz v. Savannah Bank and Trust Co. of Savannah, *supra,* and Shultz v. Mack Farland and Sons Roofing Co., Inc., 413 F.2d 1296 (5th Cir. 1969).

3. Common Business Purpose. Considerations involving common control and related activities "are also relevant in determining the existence of a 'common business purpose'", *Savannah Bank, supra.* The grocery store and the slaughterhouse share a common profit motive—they are part of the same Cor-

---

3. Interpretative Bulletin, Part 779—The Fair Labor Standards Act as Applied to Retailers of Goods or Services—graphically demonstrates the definitional difference between the word "establishment" and the word "enterprise" as relates to the Fair Labor Standards Act. "As previously stated in § 779.23, the term 'establishment' as used in the Act means a distinct physical place of business. The 'enterprise', by reason of the definition contained in section 3(r) of the Act and the tests enumerated in section 3(s) of the Act, may be composed of a single establishment. The term "establishment", however, is not synonomous with the words 'business' or 'enterprise' when those terms are used to describe multi-unit operations.

In such a multi-unit operation some of the establishments may qualify for exemption, others may not. For example, a manufacturer may operate a plant for production of its goods, a separate warehouse for storage and distribution, and several stores from which its products are sold. Each such physically separate place of business is a separate establishment. In the case of chain store systems, branch stores, groups of independent stores organized to carry on business in a manner similar to chain store systems, and retail outlets operated by manufacturing or distributing concerns, each separate place of business ordinarily is a separate establishment."

poration. The grocery store does not have to obtain its meat from more distant sources; it provides the slaughterhouse with a reliable and ongoing customer. The combination of the two operations better enables the Corporation to compete in the wholesale and retail meat markets. We find that the grocery store and the slaughterhouse have a common business purpose.

Eunice Superette is an "enterprise" as contemplated in Sections 3(r) and (s) of the Fair Labor Standards Act.

The annual gross volume of sales of the combined grocery store and slaughterhouse exceeded a total of $1,000,000 in 1968, 1969, 1970 and 1971. In each of these same years, the combined grocery store and slaughterhouse operation purchased or received more than $250,000 in items for resale, which had moved across state lines. Enterprise coverage under the 1961 amendments existed on February 1, 1968, and defendant was required to pay a minimum wage of $1.60 an hour and time and a half for overtime. Eunice Superette was not justified in continuing to pay wages under the graduated scale provided under the 1966 Amendments to the Act,[4] and was required to pay according to the 1961 coverage.

■ The purpose of the 1966 amendments was to increase the coverage of the Act to smaller enterprises, and to permit such newly covered enterprises to gradually work up to the minimum wage of $1.60 an hour. Eunice Superette was newly covered and commenced paying the minimum wages pursuant to the graduated scale as set forth in Section 6(b). However, defendant became eligible under the 1961 amendments in 1968 and was required to pay wages accordingly, Hodgson v. Jones, 453 F.2d 515, 519 (8th Cir. 1971):

"8. See Shultz v. Morris, supra 315 F.Supp. at 564–566, in which the defendant was brought within the coverage of the Act by the provisions of the 1966 amendments lowering dollar volume requirements. His dollar volume later exceeded that which would have exempted him from the Act before the amendments. The court found that when this occurred, he became subject to the higher standards of 29 U.S.C. §§ 206(a)(1) and 207(a)(1) (Supp.1971), rather than the graduated standards. The Court of Appeals affirmed on the basis of the District Court's opinion. See also, Wilcox v. Smullian Building Supply Co., 377 F.2d 480 (5th Cir. 1967)."

*See also* Shultz v. Morris, *supra,* and Hodgson v. Morris, 437 F.2d 896 (5th Cir. 1971).

■ Nor was defendant entitled to pay certain specified employees (students) at rates less than 85% of the minimum wage as allowed under Section 14(b) of the Act:

"(b) The Secretary, to the extent necessary in order to prevent curtailment of opportunities for employment, shall by regulation or order provide for the employment of full-time students, regardless of age but in compliance with applicable child labor laws, on a part-

---

4. The relevant portions of the 1966 Amendments provide: "§ 6(b) Every employer shall pay to each of his employees (other than an employee to whom subsection (a)(5) of this section applies) who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged at commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this section by the amend-

ments made to this chapter by the Fair Labor Standards Amendments of 1966, wages at the following rates: (1) not less than $1 an hour during the first year from the effective date of such amendments, (2) not less than $1.15 an hour during the second year from such date, (3) not less than $1.30 an hour during the third year from such date, (4) not less than $1.45 an hour during the fourth year from such date, and (5) not less than $1.60 an hour thereafter."

time basis in retail or service establishments (not to exceed twenty hours in any workweek) or on a part-time or a full-time basis in such establishment during school vacations, under special certificates issued pursuant to the regulations of the Secretary, at a wage rate not less than 85 per centum of the minimum wage applicable under section 206 of this title, . . ."

Applications for these students certificates must be filed by the employer with the appropriate Regional or District Office of the Wage & Hour Division. The authorized wage and hour officer will issue a certificate if the terms and conditions specified in the regulations are satisfied. See 29 C.F.R. § 519.

Defendants base their belief, admittedly mistaken, that they had satisfied the requirements of the Act by obtaining the "certificates" from the high school principals rather than the Wage & Hour Officer, they ground their defense on good faith compliance.

However, good faith is not pertinent here (it is a defense only to a prayer for liquidated damages, 29 U.S.C. § 216(b) and § 260). We must determine whether defendant's violations were "willful." The defendant knew that Section 14(b) set up specific procedures and requirements for obtaining student certificates. After its conferences with Compliance Officer Pollock it also knew of the two types of coverage under the Act. The violations were "willful", and the Secretary is entitled to recover for the full three-year prescriptive period. Coleman v. Jiffy June Farms, Inc., 458 F.2d 1139 (5th Cir. 1972), cert. denied, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972); Thomas v. State of Louisiana, 348 F.Supp. 792 (D.C.La.1972).

The Secretary has failed to prove the defendants guilty of any record keeping violations.

The plaintiff should submit a judgment for execution in accordance with Local Rule 9(e).