Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Appellant,

v.

PLAZA SHOE STORE, INC., et al., Appellees.

No. 74–1813.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1975.

Decided Aug. 19, 1975.

844

Donald S. Shire, Deputy Associate Sol., Dept. of Labor, Washington, D. C., for appellant.

J. Douglas Cassity, Springfield, Mo., for appellees.

Before CLARK,* Associate Justice, Retired, and LAY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

The Secretary of Labor appeals from the district court's determination that two dress shops do not constitute an "enterprise" with two shoe stores, thus denying employees of the dress shops the benefits of minimum wage and overtime compensation under provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq.* (1970). The district court found that the activities of the dress shops and shoe stores were unrelated and were not performed for a common business purpose. Therefore, the court concluded that the businesses were separate for purposes of the Fair Labor Standards Act (hereinafter cited as Act), although each was owned by various members of the same Springfield, Missouri, family.[1]

The parties stipulated that the two shoe stores constituted an enterprise under the Act and that the two dress shops also constituted a separate enterprise un-

der § 3(r) of the Act, 29 U.S.C. § 203(r), but that the dress shops' combined annual volume of business was less than the $250,000 minimum required by § 3(s)(1). 29 U.S.C. § 203(s)(1). Thus, the principal question presented at the trial and on appeal is whether the dress shops or either of them must be considered as part of the same enterprise with the shoe stores during the period here in question—*i. e.*, since November 1, 1969. The district court answered this question negatively and dismissed the action as to the dress shops. We disagree in part with the ruling of the district court. In our view, one of the dress shops constituted an enterprise with the shoe stores until August 1973, when it effectively severed its ties with the original shoe store operated by the family. The second dress shop, which is no longer in business, appears to have been owned and operated independently by Sarah Lee, the "modern miss" of the family, so as to fall outside enterprise coverage under the Act.

I.

The facts of this case disclose a not unusual picture of an expanding family business developed by the parents and followed thereafter by a gradual turnover of some of the business interests to the children. Norene Lee, a defendant, and her husband, Oscar, started a retail shoe store in 1952, known as the Plaza Shoe Store. They and their son, Robert, worked together in developing an extensive trade in men's, women's, and children's shoes. Robert, who had worked in the business for some 20 years, was the day-to-day manager of the Plaza Shoe Store during the period in question.

In 1966, Norene Lee, who had been particularly active in promoting the business through personal appearances on radio and television, established a dress shop or boutique in the same building in which the shoe store was located and called this establishment "The Plaza

---

* TOM C. CLARK, Associate Justice, Retired, United States Supreme Court, sitting by designation.

1. The district court opinion is reported in 22 WH Cases 229 (W.D.Mo.1974).

Place" (hereinafter Plaza dress shop). The Plaza dress shop and the shoe store shared a common entrance and the same business address, although each business was visually distinguishable by its decor.

The daughter of Norene and Oscar Lee, Sarah Lee, graduated in January 1969, from Stephens College at Columbia, Missouri, where she had studied fashion design. She subsequently joined the family business and, after a short apprenticeship, became the manager of the Plaza dress shop. Her parents gave Sarah one-third of the stock of this business upon its incorporation in 1969, while retaining the remainder of the stock.

The family business expanded in 1970 to a second location in Springfield at a site known as the Battlefield Mall, located about one mile from the Plaza stores. Norene Lee testified that they decided to open a second shoe store at the Mall in order to retain and protect their exclusive franchises in Springfield of various brands of shoes. The Lees incorporated this second store as "The Plaza Shoe Mall, Inc." (hereinafter Mall shoe store). Two-thirds of the shares of the Mall shoe store were owned by Oscar and Norene Lee; one-third were owned by Robert. Norene Lee undertook general management of this store while she continued to perform some services for the Plaza Shoe Store, including radio and television promotion and joint purchasing of inventory. Contemporaneously with the organization of the Mall shoe store, the Lee family organized a corporation, The Place Mall, Inc. (hereinafter Mall dress shop) to sell women's dresses at the same location. The Mall dress shop and the Mall shoe store, although located within the same four walls, were distinguishable by their decor and by a difference in their floor levels. They shared a common mailing address.

Sarah Lee was given two-thirds of the corporate stock of the Mall dress shop by her parents. Although Oscar and No-rene Lee served as officers and directors of all corporations here involved, the record indicates that Sarah operated the Mall dress shop without interference from her parents and separately from the Mall shoe store. Sarah actively managed the Mall dress shop while her mother participated with her in the direction of the Plaza dress shop. Sarah gained a majority ownership in both dress shops by January 1973 when, by gift and purchase from her parents, she acquired 80 percent of the capital stock of the Plaza dress shops.[2]

We have noted that each dress shop was located on the same premises as a family-owned shoe store and shared a common entrance and mailing address with the shoe store. The record also showed a number of shared operations and services among the stores at both locations. The four stores shared office facilities above the Plaza dress shop and common employees conducted the bookkeeping services for each; the expenses of this office, including the salaries of the office employees, were allocated among the four businesses. Customer accounts were combined to produce a single billing sent out in the name of the Plaza Shoe Store, Inc.[3]

In certain respects the stores operated independently, however. The office personnel maintained separate worksheets, inventory, and bank accounts for each business. The employees of both stores at each location used one time clock, although their salaries were separately paid by the respective stores. Also, the sales employees of each store were hired, trained, and fired separately, and with minor exceptions, their duties were not interchangeable between the shoe stores and dress shops. The four stores used a common delivery dock behind the Plaza stores, but excess inventory for the Plaza shoe store and Plaza dress shop was stored in separate areas. Although the shoe stores and dress shops generally

2. The Mall dress shop was dissolved as a corporation by July 1973. Its assets and liabilities were assumed by The Plaza Place.

3. The stores utilized one credit system with one ledger card for each customer. The central office then allocated the receipts among the stores.

conducted separate advertising programs, the four stores participated in a joint advertisement in the yellow pages of the telephone book.

## II.

■■ The question of whether several businesses constitute an "enterprise" is a question to be resolved in each case on the basis of all the particular facts of the case. Here, the parties present a record of largely undisputed facts. Thus, whether these facts establish the existence of an enterprise becomes a question of law and we are not bound by the clearly erroneous rule in testing the validity of the conclusion reached by the district court. See Schultz v. American Can Company-Dixie Products, 424 F.2d 356, 360 n.6 (8th Cir. 1970); Wirtz v. Barnes Grocery Co., 398 F.2d 718, 722 (8th Cir. 1968).

■ The Fair Labor Standards Act was enacted to provide a minimal standard of living necessary for the health, efficiency, and general well-being of workers and to prescribe certain minimum standards for working conditions. In applying the Act to the facts at hand, we must liberally construe it "to apply to the furthest reaches consistent with congressional direction" in fulfillment of its humanitarian and remedial purposes. Mitchell v. Lublin, McGaughy & Associates, 358 U.S. 207, 211, 79 S.Ct. 260, 264, 3 L.Ed.2d 243 (1959). See also Brennan v. Wilson Building, Inc., 478 F.2d 1090, 1094 (5th Cir.), cert. denied, 414 U.S. 855, 94 S.Ct. 156, 38 L.Ed.2d 105 (1973); Hodgson v. University Club Tower, Inc., 466 F.2d 745, 746 (10th Cir. 1972).

A congressional amendment introduced the concept of "enterprise" coverage into the Act in 1961. The amendment substantially broadened the coverage of the Act by bringing those workers employed in an enterprise engaged in interstate commerce within the ambit of the minimum wage and maximum hours provisions. Fair Labor Standards

Amendments of 1961, Pub.L. No. 87–30, § 2(c), 75 Stat. 65.

The Secretary asserts that the four retail businesses are subject to the provisions of the Act because they constitute an "enterprise" as defined in §§ 3(r) and 3(s)(1) of the Act, 29 U.S.C. §§ 203(r) and (s)(1). The pertinent language of the statutory definition provides as follows:

As used in this Act—

\* \* \* \* \* \*

(r) "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements \* \* \*. [29 U.S.C. § 203(r).]

(s) "Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and which—

(1) \* \* \* beginning February 1, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated) \* \* \*. [29 U.S.C. § 203(s)(1).][4]

■ The Act describes three elements which must coexist before the corporate defendants herein can be considered a single enterprise: (1) related activities; (2) unified operation or common control; and (3) a common business purpose.

4. The Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, § 6(a)(5), 88 Stat. 59–60, made certain changes in the language of §§ 3(r) and 3(s), effective May 1, 1974, which are not pertinent here.

*Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 518, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973); *Brennan v. Veterans Cleaning Service, Inc.*, 482 F.2d 1362, 1366 (5th Cir. 1973); *Wirtz v. Savannah Bank & Trust Co.*, 362 F.2d 857, 859 (5th Cir. 1966); *see Wirtz v. Barnes Grocer Co., supra,* 398 F.2d at 722. None of these elements has been expressly defined in the Act, but each has been the subject of congressional comment, interpretative statements of the Wage-Hour Administrator, and construction by the courts.

A. *Related Activities and Common Business Purpose.*

Our examination of the element of "related activities" begins with the report of the Senate Committee on Labor and Public Welfare prepared in connection with the 1961 amendments to the Act. That report reads in pertinent part as follows:

> [A]ctivities are "related" when they are the same or similar, such as those of the individual retail or service stores in a chain, or departments of an establishment operated through leasing arrangements. They are also "related" when they are auxiliary and service activities such as central office and warehousing activities and bookkeeping, auditing, purchasing, advertising, and other services. Likewise, activities are "related" when they are part of a vertical structure such as the manufacturing, warehousing, and retailing of a particular product or products under unified operation or common control for a common business purpose. [S.Rep. No. 145, 87th Cong., 1st Sess. 41 (1961), reprinted in 1961 U.S.Code Cong. & Admin.News pp. 1620, 1660.]

The Wage-Hour Administrator issued an interpretative statement, shortly after the enactment of the 1961 amendments, regarding application of the Act to retail operations. A portion of that statement, defining "related activities," follows:

> In the case of an enterprise which has one or more retail or service establishments, all of the activities which are performed for the furtherance of the common business purpose of operating the retail or service establishments are "related activities." It is not material that the enterprise sells different goods or provides different services, or that it operates separate retail or service establishments. As stated in the definition, the enterprise includes all related activities whether performed "in one or more establishments." Since the activities performed by one retail or service establishment are the "same or similar" to the activities performed by another, they are, as such, "related activities." (See Senate Report No. 145, 87th Cong. 1st Sess. p. 41.) For example, in operations of a single retailing business a drug store may sell a large variety of different products, and a grocery store may sell clothing and furniture and other goods. Clearly all of these activities are "related." Similarly it is clear that all activities of a department store are "related activities," even if the store sells a great variety of different types of goods and services and even if, as in some cases, the departmentalized business is conducted in more than one location, as where the department selling garden supplies or electrical appliances is located on separate premises. Whether on the same premises or at separate locations, the activities involved in retail selling of goods or services of any type, are related activities, and they will be considered one enterprise where they are performed, through unified operation or common control, for a common business purpose. [29 C.F.R. § 779–207 (1974).]

The district court, in viewing the activities of the dress shops as unrelated to that of the shoe stores, focused on differences between the merchandise handled by each and on the clientele served. The district court noted that the dress shops displayed the "mod" styles attractive to young women, while the shoe store catered to the family trade. How-

ever, legislative history and long-standing administrative rulings focus not on the variety of the goods that are sold, but rather on the similarity of the business operations, such as retail sales, in determining whether the activities are "related."

■ In this case, we conclude that the shoe store and dress shop at each location engaged in related activities, for at each location the stores sold articles of wearing apparel (shoes, dresses, handbags, hose, and accessories) to the general public entering the premises which housed both stores. These activities clearly fall within the congressional and administrative concept of related activities. Furthermore, this conclusion is supported by several court decisions. *Compare Brennan v. Patio Cleaners, Inc.,* 373 F.Supp. 987, 989–90 (S.D.Ohio 1974); *Hodgson v. Eunice Superette, Inc.,* 368 F.Supp. 639, 641–42 (W.D.La.1973); *Jackson v. Airways Parking Co.,* 297 F.Supp. 1366, 1377–78 (N.D.Ga.1969); and *Wirtz v. Old Dominion Corp.,* 286 F.Supp. 378, 381 (E.D.Va.1968) *with Hodgson v. University Club Tower, Inc., supra,* 466 F.2d at 747–48.[5]

Moreover, we find that the two stores at each location shared a "common business purpose." The Wage-Hour Administrator observed in an opinion in July 1968 that

[t]he courts have consistently stressed practical considerations and economic reality rather than technical concepts in the determination of coverage questions under this act * * *.

* * * * * *

[C]ommon ownership of "related activities" carries considerable weight toward a determination that there is a "common business purpose." Generally, when a corporation is formed to carry out a particular business objective, all the activities in furtherance

thereof which it may perform through unified operation or common control will, in economic reality, be related and for a common business purpose even though, in isolation, they may be quite dissimilar in kind and would, if separately performed, constitute separate business enterprises. * * * *Wirtz v. Columbian Mutual Life Insurance Co.,* 380 F.2d 903 (C.A. 6). [Lab. Rel.Rep. WHM 91:337.]

*See Brennan v. Arnheim & Neely, Inc., supra,* 410 U.S. at 519, 93 S.Ct. 1138; *Brennan v. Veterans Cleaning Service, Inc., supra,* 482 F.2d at 1367; *Brennan v. Longview Carpet & Specialty Co.,* 373 F.Supp. 987 (E.D.Tex.1974); *Hodgson v. Eunice Superette, Inc., supra,* 368 F.Supp. at 642–43; *Hodgson v. Greene's Propane Gas Service,* 19 WH Cases 935, 942 (M.D.Ga.1971).

**B. Common Control or Unified Operation.**

The remaining question posed by this appeal is whether the dress shops and the shoe stores can be said to be under common control or unified operation. The record in this case does not establish the existence of a unified operation among the two dress shops and the two shoe stores, even though they did share the services mentioned above.

The Wage-Hour Administrator has indicated that common control refers to the performance of the related activities of the businesses and that common ownership of the businesses may be a significant factor in determining control. 29 C.F.R. § 779.215(b). *See also Wirtz v. Barnes Grocer Co., supra,* 398 F.2d at 721–22. We give special consideration to the fact that one family participated in the ownership of the four retail stores.

Oscar and Norene Lee and their son Robert owned the Plaza shoe store. At the time of trial Robert owned 52 percent of the stock and his parents owned the remaining 48 percent. The parents

---

5. *See also Brennan v. Longview Carpet & Specialty Co.,* 373 F.Supp. 987 (E.D.Tex.1974); *Hodgson v. Leeco Gas & Oil Co.,* 20 WH Cases 958, 962 (M.D.Fla.1972); *Hodgson v. Arlington* Protective Agency, 20 WH Cases 666, 667 (E.D.Va.1972); *Wirtz v. Country Club Acres, Inc.,* 18 WH Cases 627, 629 (N.D.N.Y.1968).

owned two-thirds of the Mall shoe store and Robert owned a one-third interest. Until January 1973, the parents owned two-thirds of the stock of the Plaza dress shop and one-third of the Mall dress shop. Sarah Lee owned the balance of the stock of both dress shops.

A review of the course of the development of the four businesses, amplified by findings of the district court, serves to convince us that the two shoe stores and the Plaza dress shop operated substantially under the common control of the Lee family. Sarah Lee, however, operated and controlled the Mall dress shop, from its inception, separately from the influence of the rest of the family. Moreover, after August 1973 Sarah effectively severed the Plaza dress shop from the control of the family.

As noted earlier, Mr. and Mrs. Lee and Robert developed a large family shoe business at the Plaza location and subsequently extended their business to the Battlefield Mall. Robert managed the Plaza shoe store with some assistance from his mother. Norene Lee managed the second shoe store in conjunction with the first in a manner which, the Lees admit, constituted a single enterprise under the Fair Labor Standards Act.

Norene started the Plaza dress business as an adjunct to the Plaza shoe store. She did not enjoy the dress business and, when her daughter finished school, she found the opportunity to transfer the management of the Plaza dress shop. She testified to this effect:

I never liked the dress business, and I wanted to give her [*i. e.*, Sarah]—I just would have handed it to her. She said, "I will earn it myself." And she wanted me to set it up and we set it up the way she wanted to, because it was on condition, "Mother, I run this store myself. It is mine, I want to

run it." I decided she could run it. And if she falls flat on her face, it is her business, not mine. I am out of that shoe store—dress shop. I had learned something about the dress business, not too much, when she came into it, and what I knew, of course, I advised her on how to buy, how to handle money, how to manage and store policies, and things like that. But then she set up her own.

In describing her relationship with the Plaza dress shop, Sarah Lee testified that she "went into assistant management and in two weeks, I conferred with her [*i. e.*, Norene] again and went in as partners."

The record shows that Sarah took over the full-time management and operation of the Mall dress shop in July 1970 and, at the same time, appointed an assistant manager for the Plaza dress shop. During the period that Sarah devoted her time to the Mall dress shop, Norene assisted in the hiring and firing of employees and other management duties at the Plaza dress shop. The operation of the Plaza dress shop changed little during the time Sarah was at the Mall dress shop. The Plaza dress shop continued to share a common entrance and identical business hours with the Plaza shoe store.

In January 1973 Sarah acquired 80 percent of the corporate stock of the Plaza dress shop. By July 1973 the Mall dress shop had terminated operations and Sarah had returned as active manager of the Plaza dress shop. Sarah determined at this time to erect a partition between the Plaza dress shop and shoe store. She consulted with and obtained the agreement of her parents in their capacity as members of the board of directors to physically separate the two businesses.[6] After the partition was

---

**6.** The testimony relating to this incident is as follows:

Q I see, okay. Now, you said you put up this partition that was just recently established in August of '73. I think you said that was your idea, right, and you wanted it because you wanted to get completely on your own? How did you get permission to establish the partition?

A What kind of permission?

Q Did you just call a bunch of people and tell them to start nailing it up? Did you ask your mother or brother—

built, Sarah had installed a separate outside entrance and instituted business hours different from those of the Plaza shoe store. The erection of the partition in August 1973 not only served to separate the two businesses physically but also marked the point in time at which Sarah Lee, who then owned 80 percent of the corporate stock, asserted control over the Plaza dress shop separate from the control of the family.

### III.

 The record indicates that Norene Lee was the dominant person in the organization and promotion of the various businesses owned and operated by members of the Lee family. The record also establishes that Sarah, her daughter, was a strong-minded person who wanted to operate her own business. Following the capital investment of her parents and their grant of two-thirds of the corporate stock in the Mall dress shop, Sarah established and promoted that business as her own, without interference from any of the other members of her family. Although the Mall dress shop was operated within the same four walls as the Mall shoe store, we conclude that Sarah operated the dress shop as a separate business and, thus, we agree with the district court that the Mall dress shop cannot be said to be a part of the same enterprise as the two shoe stores.

With respect to the Plaza dress shop, it is clear that the family, in particular Norene, continued to play a significant role in its operation and control at least until 1973. We find that the Plaza dress shop remained a part of the family business ventures and that a common element of control existed among the two shoe stores and this dress shop. Thus, we conclude that the Plaza dress shop and the two shoe stores were one enterprise under the Act until August 1973.

As we have described above, the umbilical cord of common control connecting the Plaza dress shop to the Plaza shoe store had been severed by August 1973. Therefore, from and after that date the Plaza dress shop must also be deemed a separate business, not connected with the shoe stores for purposes of coverage under the Act.

Accordingly, we reverse in part and remand this case to the district court for the entry of an appropriate judgment in conformity with this opinion.

A No, I asked people on the Board, that was a big expense, this wasn't a fly-by-night I had dreamed up. It was approved by the Board.

Q Who is the Board?
A The Board is Mr. and Mrs. Lee.
Q And you?
A And me.