Ray MARSHALL, Secretary of
Labor, Plaintiff,

v.

ELKS CLUB OF HUNTINGTON, INC., a corporation, Individually and doing business as Lodge # 313 Benevolent and Protective Order of Elks, and Lodge # 313 Benevolent and Protective Order of Elks, Defendants.

Civ. A. No. 73–102–H.

United States District Court,
S. D. West Virginia.

Dec. 8, 1977.

William J. Kilberg, Dept. of Labor, Washington, D. C., Marvin M. Tincher, Thomas L. Rasnic, U. S. Dept. of Labor, Nashville, Tenn., John A. Field, III, U. S. Atty., Charleston, W. Va., for plaintiff.

Robert H. Burford, Beckett, Burford & James, Huntington, W. Va., Edward W. McCabe, Nashville, Tenn., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HADEN, District Judge.

This civil action was instituted by the Secretary of Labor on September 26, 1973, under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, *et seq.* (hereinafter referred to as the Act), alleging that the Defendants violated certain provisions of the Act and the regulations issued pursuant thereto. Plaintiff seeks judgment permanently enjoining and restraining the Defendants from violating the provisions of the Act, including the restraint of the withholding of payment of any unpaid back wages due the employees of the Defendants. The Defendants deny that they are subject to the provisions of the Act.

There is no substantial issue of fact in conflict between the parties. An extensive stipulation of facts was filed. The only issue before the Court is whether the Defendants are subject to the provisions of the Act.

This action came on for trial before Chief Judge Knapp of this Court, sitting without a jury, on December 18, 1975. The case was reassigned to this Judge for disposition. The Court, having considered the complete record in this case, including the exhibits, pleadings, depositions, stipulations and oral testimony, and the memoranda and arguments of counsel, hereby makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The Plaintiff in this action is Ray Marshall, Secretary of Labor, successor to John T. Dunlop, resigned, and is duly empowered to administer and enforce the Fair Labor Standards Act, as amended.

2. Defendant, Lodge 313 Benevolent and Protective Order of Elks (hereinafter the Lodge), is an unincorporated association existing under and by virtue of the laws of the State of West Virginia. The Defendant, Elks Club of Huntington, Inc. (hereinafter the Club), is a corporation incorporated in the State of West Virginia. The principal location of both the Club and the Lodge is 1015 Fourth Avenue, Huntington, Cabell County, West Virginia, within the jurisdiction of this Court.

3. The Defendants have employed and are employing many employees in and about their aforesaid place of business in regularly ordering, receiving, storing, handling, selling and otherwise working on food, beverages, goods, supplies and materials, produced by and received from sources outside the State of West Virginia.

4. Plaintiff seeks back wages from the Defendants for the period beginning September 26, 1970, until November 30, 1974. Prior to September 26, 1970, Defendants were aware that Plaintiff contended that the provisions of the Fair Labor Standards Act were applicable to them, but the Defendants have always denied that coverage of the Act extended to them.

5. Prior to April 1, 1971, the Club and the Lodge did not have a combined annual dollar volume of sales or receipts in excess of $250,000 (exclusive of excise taxes at the retail level which are separately stated). Subsequent to April 1, 1971, the Defendants

had a combined annual dollar volume of sales or receipts in excess of $250,000 (exclusive of excise taxes at the retail level which are separately stated). Neither the Club nor the Lodge had separate sales or receipts amounting to as much as $250,000 at any time material since April 1, 1971. At all times since prior to September 26, 1970, the annual dollar volume of sales made or business done by the Benevolent and Protective Order of Elks of the United States (hereinafter BPOE) has been substantially in excess of $1,000,000.

6. The Lodge is a local lodge of the BPOE, and, as such, is a part of a national fraternal organization which was incorporated on June 19, 1895, in the District of Columbia. The administrative body of the BPOE is known as the Grand Lodge. The membership of the Grand Lodge consists of the Exalted Rulers of all local lodges, past Grand Exalted Rulers in good standing, past Exalted Rulers in good standing, officers, members of committees and District Deputy Grand Exalted Rulers. An Exalted Ruler is the highest elected officer of a local lodge.

7. The purposes of the organization as stated in the Preamble to its Constitution are:

"To inculcate the principles of Charity, Justice, Brotherly Love and Fidelity; to promote the welfare and enhance the happiness of its members; to quicken the spirit of American patriotism; to cultivate good fellowship; to perpetuate itself as a fraternal organization, and to provide for its government . . . ."

8. The activities of the Lodge are fraternal, social and charitable. Its receipts are from dues, initiation and affiliation fees, social activity charges, interest on deposits and charitable contributions by members earmarked for specific purposes. The Club is engaged in the business of operating a private bar and restaurant. Its receipts are from sales to members and their guests, interest on deposits and rent from the Lodge. Members in good standing of the Lodge are also members of the Club. Suspension from the Lodge results in automat-

ic suspension from the Club, but suspension from the Club does not result in suspension from Lodge activities.

9. The Club and Lodge occupy the same premises, with certain areas of the building designated as "Lodge" activity areas and other areas as "Club" activity areas. The Club and Lodge have the same telephone listing, the same utility bills, a common entrance into the facilities, common service entrance, and the same bylaws. The Club and Lodge hold a single Consumers' Sales and Service Tax Certificate of Registration from the State of West Virginia. The Club and Lodge file a single income tax return, which return is filed on a Department of Treasury, Internal Revenue Service Form 990 return. This is a tax return which can be filed only by an organization exempt from income tax as a nonprofit organization under section 501(c) of the Internal Revenue Code. The Club and Lodge use the same "Employer Identification Number" for income tax purposes, and the Club issues all W–2 Forms to employees, including employees who are supposed to be employees of the Lodge. The budget of both the Club and the Lodge is voted on and approved at a meeting of the Lodge.

10. According to the By-Laws of the Lodge at Article IX, the operation, control, management and ultimate authority of all Club activities are subject to the control of the Lodge membership. Audit reports show that the Lodge's audit committee files a combined report of the audit performed on the Club and Lodge business. The Club and Lodge have common insurance policies which insure both Defendants from losses as specified in the policies.

11. On October 21, 1971, and February 8, 1973, the Lodge members voted to transfer from the Lodge's accounts to the Club's checking account $15,000.00 and $20,000.00, respectively. These transfers were made so that the Club could pay its bills. The audit reports filed annually by the Lodge lists all property including stocks, bonds, real estate, furniture and fixtures as property of the Lodge.

12. The *Membership Control Manual* issued by the Grand Lodge BPOE, states:

At page 8, "It is the fraternal duty of the Lodge in the jurisdiction of which the 'stray' Elk lives to offer him the hand of fellowship and to invite the 'stray' Elk to participate in both the Club and Lodge activities. This program, if enthusiastically followed by a Lodge, will not only prevent many 'stray' Elks from dropping their membership but also will produce many excellent members for the Lodge."

At page 22, "After Lodge closes, the new member's proposer or a friend assigned by the Committee on Indoctrination, should take the Brother into the Club rooms and see that he is introduced to as many of the members present as possible. He should meet the steward and have an explanation of the various card games played or other social activities enjoyed by the members. This evening, and the next few meeting nights, will largely determine the new member's attendance habit. If he is made to feel at home and real part of his Lodge, he will likely attend Lodge frequently and be an enthusiastic worker. This part of the indoctrination program cannot be stressed too strongly."

13. The day-to-day activities of the Club are under the supervision and conduct of its Board of Directors. The Board of Directors of the Club and the Board of Trustees of the Lodge have been the same persons since March 22, 1974. Prior to that date, the Board of Directors of the Club consisted of the Lodge's Exalted Ruler and Esteemed Leading Knight (the Lodge's principal officers), three members at large from the Lodge and a chairman and secretary who were also Lodge members. The Board of Directors of the Club are elected at Lodge meetings from time to time as vacancies occur. Under the present bylaws, the Lodge members elected as trustees of the Lodge, the Exalted Ruler and Esteemed Leading Knight become the Board of Directors of the Club without formal election. The Board of Directors of the Club and the Board of Trustees of the Lodge meet separately and on different nights.

14. Jackie S. Maynard, bookkeeper, regularly performs work for both the Club and the Lodge and is compensated by both. The duties of Mrs. Maynard on behalf of the Club include checking petty cash each day, making bank deposits and recording receipts and disbursements. Mrs. Maynard's duties for the Lodge include accepting dues and application fees, issuing cards and entering receipts and disbursements. Mrs. Maynard maintains one daily journal which includes receipts and disbursements for both Club and Lodge.

15. The Club income and Lodge income are combined for purposes of audits, income tax returns and reports to the Grand Lodge BPOE. The income is also commingled so that transfers are made from Lodge to Club as the need arises.

16. A. E. Kallmarten, former Secretary of the Lodge and former Club Manager of the Club, is paid $150.00 per month for life not to engage in any competitive employment which requires performance of services similar in nature to the service formerly performed by him as Club Manager for the Club.

17. The Club serves meals and beverages from a full menu in its dining room area. The menu is similar to menus in public restaurants. The Club serves drinks from its lounge facilities. The Lodge's functions are usually followed by activities in the Club's lounge, dining area or card room. Substantially all of the food and beverage served at Lodge social functions is prepared and served by the Club's employees. All of the Club's income is derived from the sale of food, beer, liquor and sundry items and from its game room activities which sales are made only to the Lodge members, their families and guests and visiting Elks.

18. The Lodge received its charter from the BPOE on July 11, 1895.

19. All local lodges pay per capita dues each year to the Grand Lodge. The amount of such dues is based upon the number of members the local lodge has on its membership rolls as of March 31 of each year. For the years 1970 through 1973 Grand Lodge dues were $2.00 per member per year, which was broken down as follows: (a) For subscription to the Elks Magazine $1.00, (b)

For Grand Lodge expenses $0.80, and (c) For National Service Commission $0.20. In 1974 the amount for Grand Lodge expenses was increased to $1.05 per member, increasing the total to $2.25 for that year. The Lodge paid the BPOE Grand Lodge dues in the following amounts for the years stated:

| | |
|---|---|
| 1970 | $4408.00 |
| 1971 | $4450.00 |
| 1972 | $4438.00 |
| 1973 | $4808.00 |
| 1974 | $5798.00 |

The Lodge is not required to make any other payments to the BPOE. However, the Lodge does, from time to time, purchase membership cards, ritual materials, copies of the Constitution and Statutes, etc. from the BPOE.

20. The Grand Lodge, as the administrative body of the BPOE, passes laws by which the local lodges are governed, issues dispensations and charters for institution of local lodges and provides for the manner in which charters may be suspended or forfeited.

21. According to a BPOE publication, *What It Means To Be An Elk,* the rights and privileges of every member of a BPOE local lodge includes "the right to attend the meetings of any other local lodge, and to avail himself of the facilities of any clubhouse maintained by such other lodge, in accordance with its rules and regulations relating thereto. And he is as much amenable to the Grand Lodge Statutes as he is to the bylaws of his own lodge."

22. The Elks National Home located at Bedford, Virginia, is available to every member of the Elks who meets certain qualifications. The initial cost of the Home was provided by assessments upon every member. The cost of additions have been provided in large part from the net earnings of *The Elks Magazine.* The general maintenance cost is an expense of the Grand Lodge which is covered by the annual dues paid by every active member of the BPOE. To the extent that a resident of the Home does not have sufficient assets or income, the subsistence expense of such resident is paid in part by the Grand Lodge and in part by the resident's own lodge, which must file the application to obtain such member's admittance to the Home and approve his admission.

23. The tax exemption obtained by the BPOE under section 501(c)(8) of the Internal Revenue Code was extended in 1951 to cover state associations and local lodges. The local lodges also use the "Tax Determination Letter" issued under 501(c)(8) of the Internal Revenue Code to obtain bulk mailing privileges from the postal authorities as a tax exempt organization.

24. The Grand Lodge has worked out a system of notification whereby *The Elks Magazine* upon receiving a request to change the address of an Elk to one outside the jurisdiction of his home lodge, sends notice of the name and address of the "stray" Elk to the lodge in the jurisdiction to which the "stray" Elk has moved. A "stray" Elk is an Elk who is not affiliated with a lodge. According to the *"Membership Control Manual",* at page 8, ". . . upon receipt of this notice from the Magazine, the Secretary should immediately add the 'stray' Elk's name to the Lodge mailing list so that he will receive bulletins and notices of social and Lodge events. A letter of welcome from the Lodge, signed by the Exalted Ruler, should be written to the 'stray' Elk at once, advising him of the location of the Lodge, its meeting night, club hours and facilities and inviting him to visit the Lodge. If practical, personal contact should be made with the 'stray' Elk by one of the Officers, a special committee, or some Brother of the Lodge who lives nearby. The invitation to visit the Lodge should be as personal as possible and should be specific, stating a certain event and date . . . ."

The Manual further states at page 9, "While every Lodge should keep its 'stray' Elk file up to date, if for some reason the list has become obsolete, a new list can be secured from *The Elks Magazine* by submitting a list of the post offices in the jurisdiction of the Lodge. The Magazine will supply a list of the names of all 'stray' Elks receiving the Magazine at these post of-

fices. This procedure is expensive for the Magazine and should not be requested except as a last resort."

25. The Charleston, West Virginia, Lodge and the Defendant Lodge file similar reports with the Grand Lodge, have the same constitution and bylaws and engage in the same type activities and programs. The Charleston Lodge has club facilities available to visiting Elks. Most of the Elks' Lodges in the West Virginia area have club facilities similar to the Huntington Lodge.

26. *The Elks Magazine* is a national journal, published by the BPOE at Chicago, Illinois, and distributed to its entire membership, " . . . to serve as a direct means of communication with the individual members, and as a medium through which the history, traditions, purposes and aspirations of the Order could be taught, and through which information of its current activities might be disseminated." *The Elks Magazine* is also a medium for publicity and advertising used by national advertisers. *The Elks Magazine* has contributed substantial sums to the BPOE and the Grand Lodge. According to the BPOE publication, *What It Means To Be An Elk*, at page 23, "*The Elks Magazine* has established itself as a desirable publicity medium for national advertisers, which is perhaps the best evidence of its popularity. And from this source it derives a revenue which, with its income from subscriptions, including one dollar per year from each member as a part of his annual dues, has enabled it to show consistent annual net earnings of substantial sums, which have been available to the Grand Lodge."

The annual report of the Elks National Memorial and Publication Commission for 1969 states, at page 18 of such report, that, "If it had not been for the payments so realized from the Magazine by the Grand Lodge the per capita tax for many years would, of necessity, have had to be increased, but as a result of the amounts turned over by the Commission from surplus earnings the Grand Lodge budget has been balanced, provision made for a Reserve Fund and other expenditures, such as hereinbefore set forth, have been made."

From 1968 to March 1, 1974, the advertising income from *The Elks Magazine* has been in excess of $4,000,000 and the subscription income has been in excess of $9,000,000. The profit or earned surplus of income over expenses has been used for various BPOE projects including the building of additions to the Elks National Home in Bedford, Virginia.

27. Prior to the convention of the Grand Lodge held in 1973, membership in the BPOE, the Club and the Lodge was restricted to "white male citizens of the United States of America, of sound mind and body, of good character, not under the age of 21 years and who believe in God." Subsequent to said convention, the membership requirements were changed in the BPOE and in the Club and Lodge, by deleting the requirement that the applicant be a "white" citizen. The requirement that prospective members be "white" created difficulties with many of the local lodges. It resulted in the revocation of the charters of several lodges including the charters of Lodge No. 410, Madison, Wisconsin, Lodge No. 299, Sheboygan, Wisconsin, and Lodge No. 750, Kenosha, Wisconsin, which lodges voted to delete the word "white" from their membership qualifications.

28. Prior to the amendment of section 141 of the Grand Lodge Statutes at the annual meeting in 1973, the Grand Exalted Ruler had the authority to appoint, and did appoint, trustees to act as conservators of property owned by certain subordinate lodges which had either surrendered their charter or had had their charter revoked. One such lodge was Lodge No. 119, Middlesboro, Kentucky, which was taken over on March 3, 1966, and which had bank deposits as of February 7, 1969, in the amount of $111,432.40, and assets of $132,000.00 in 1974 according to the report of the Grand Trustees at the 1974 Annual Proceedings. According to the proceedings of the Grand Lodge for the years 1969 to 1974, 32 lodges have surrendered and/or had their charters revoked. Prior to the Grand Lodge proceedings in 1973, 15 lodges had surrendered

and/or had had their charters revoked. Of these 15 lodges, the Grand Exalted Ruler had appointed conservators over the assets of nine lodges. The 1974 proceedings show that in 1974, the conservators appointed over the past several years had authority over $304,918.43 in assets of defunct lodges.

29. At the time section 141 of the Statutes of the BPOE was amended at the 1973 proceedings of the Grand Lodge, the following statement was made, at page 271 of such proceedings " . . . and it is further felt that section 141 has been a bit embarrassing with the tax authorities, as past Grand Exalted Ruler Edward McCabe told the Exalted Rulers on Tuesday, with this enterprise theory so that any Lodge, whatever its size, may be held to the responsibility of paying the minimum wage and hour requirements."

30. Bylaws of local lodges must be submitted to the Judiciary Committee of the Grand Lodge for approval. Any bylaw provision of a local lodge which conflicts with the constitution or a statute of the BPOE is null and void. Amendment of the Statutes of the BPOE by the Grand Lodge results in amendment of the local lodges' bylaws on the subject of said amendment automatically by reason of section 173 of the Grand Lodge Statutes.

31. Before a group of persons can organize a lodge of the BPOE they must obtain a dispensation from the Grand Lodge Exalted Ruler and follow the rules of procedure set forth in the Grand Lodge Statutes as administered by the Grand Lodge Organization Committee. No lodge can be formed without going through the proper procedures and forms as formulated by the Grand Lodge. The Board of Grand Trustees, who are the fiscal officers of the BPOE, examines the condition of all lodges acting under a dispensation to determine whether said lodges have complied with the laws of the Order and are worthy to receive charters. The Board then, with the approval of the Grand Exalted Ruler, grants charters to those found worthy. In determining whether a new lodge is feasible in an area the Board of Grand Trustees considers, among other things, the population of the area, economic factors, and how other lodges in the area will be affected. Each new lodge pays a fee for its dispensation and a fee for its charter to the Grand Lodge.

32. Each subordinate lodge, including any corporation, club, social parlor or other facility under the control of such lodge, must obtain the approval of the Board of Grand Trustees prior to the purchase, sale, erection of a new building, alteration or additions to existing buildings (if in excess of $5,000), purchase of certain furnishings, fixtures and equipment (if in excess of $5,000) and/or placing of mortgages on their property. The Grand Lodge Trustees' annual reports, as contained in the proceedings of the Grand Lodge, list the permits granted each fiscal year by the Board of Trustees. There are occasions when the Grand Trustees have failed to give approval to purchase, sell, erect new buildings or engage in other conduct which requires prior approval of the Grand Trustees. If approval is denied, the lodge does not proceed with the proposed expenditure.

33. The Grand Lodge maintains membership records on lodges that have lost their charters. In the event a member of such a lodge wants to become affiliated with another lodge, such person applies to the office of the Grand Secretary of the Grand Lodge for a "Certificate of Status."

34. In 1972–1973 the Grand Lodge provided $133,181.00 in funds to approximately nine lodges located in Pennsylvania and New York to assist those lodges in repairing their facilities after damage by Hurricane Agnes.

35. The BPOE, through its Grand Lodge, provides instructions to the local lodges on how to obtain and retain members, manage clubs and develop proper accounting methods. It also has provided representatives on a national level, concerning issues before the Department of Labor and the Internal Revenue Service.

36. The BPOE exercises no control over operation of the Club or any other social clubs in the country with respect to prices,

wages, menu and the like. There is no centralized purchasing. The BPOE is not financially in or involved with the operation of a local club—it does not receive any portion of any profits made, nor does it contribute toward any losses sustained.

37. The control of a local club is vested exclusively in the members of the local lodge establishing such club by Section 209 of the BPOE Statutes.

38. Back wages due Defendant's employees, if any, have been stipulated as follows: (a) If both of the Defendants in conjunction with the BPOE constitute a single "enterprise" within the meaning of section 3(r) of the Act, the amount of back wages due is $5,425.00; (b) If the two Defendants constitute an "enterprise" standing alone, but not in conjunction with the BPOE, then the amount of back wages due is $5,258.37; (c) If the Lodge and the BPOE constitute an "enterprise", but not in conjunction with the Club, then no back wages will be due as a result of this proceeding; and (d) If the Defendants are not an enterprise in any respect, then no back wages will be due as a result of this proceeding.

## CONCLUSIONS

1. This Court has jurisdiction of this action under section 17 of the Act. 29 U.S.C. § 217.

2. "In applying the Act to the facts at hand, we must liberally construe it 'to apply to the furthest reaches consistent with congressional direction' in fulfillment of its humanitarian and remedial purposes." *Brennan v. Plaza Shoe Store, Inc.*, 522 F.2d 843, 846 (8th Cir. 1975), *citing, Mitchell v. Lublin, McGaughy & Associates*, 358 U.S. 207, 211, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959).

3. Sections 6, 7 and 11(c) [29 U.S.C. §§ 206, 207 and 211(c)] are applicable to the Defendants in this action if the Defendants taken together or the Defendants taken together with the BPOE constitute an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of sections 3(r) and 3(s)(1) of the Act. [29 U.S.C. 203(r) and (s)(1)].

4. Section 3(s)(1), 29 U.S.C. § 203(s)(1) provides, in pertinent part:

" 'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise which has employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and which—

(1) . . . beginning February 1, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated); . . . ."

5. Section 3(r), 29 U.S.C. § 203(r), provides, in part:

" 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor: *Provided,* That within the meaning of this subsection, a retail or service establishment which is under independent ownership shall not be deemed to be so operated or controlled as to be other than a separate and distinct enterprise by reason of any arrangement, which includes, but is not necessarily limited to, an agreement (1) that it will sell, or sell only, certain goods specified by a particular manufacturer, distributor, or advertiser, or (2) that it will join with other such establishments in the same industry for the purpose of collective purchasing, or (3) that it will have the exclusive right to sell the goods or use the brand name of a manufacturer, distributor, or advertiser within a specified area, or by reason of the fact that it occupies premises leased to it by a person who also

leases premises to other retail or service establishments."

6. The first question which must be answered is whether the Club and Lodge constitute an enterprise. "The question of whether several businesses constitute an 'enterprise' is a question to be resolved in each case on the basis of all the particular facts of the case." *Brennan v. Plaza Shoe Store, Inc.*, 522 F.2d 843, 846 (8th Cir. 1975). Where the facts are largely undisputed, as here, the existence of an enterprise becomes an issue of law. *Id.*

7. The Act describes three elements which must coexist before the Defendants may be found to constitute an enterprise: (1) related activities; (2) unified operation or common control; and (3) a common business purpose. *Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 518, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973). Unfortunately, none of these elements are expressly defined in the Act.

8. The report of the Senate Committee on Labor and Public Welfare prepared in connection with the 1961 amendments to the Act reads, in part:

"[A]ctivities are 'related' when they are the same or similar, such as those of an individual retail or service stores in a chain, or departments of an establishment operated through leasing arrangements. They are also 'related' when they are auxiliary and service activities such as central office and warehousing activities and bookkeeping, auditing, purchasing, advertising, and other services. Likewise, activities are 'related' when they are part of a vertical structure such as the manufacturing, warehousing, and retailing of a particular product or products under unified operation or common control for a common business purpose."

S.Rep. No. 145, 87th Cong., 1st Sess. 41 (1961), reprinted in 1961 U.S.Code Cong. & Admin.News pp. 1620, 1660; 29 C.F.R. 779.-206(a).

9. The Regulations promulgated pursuant to the Act state that:

"[t]he Senate Report on the 1966 amendments makes it plain that related,

even if somewhat different, business activities can frequently be part of the same enterprise, and that activities having a reasonable connection with the major purpose of an enterprise would be considered related."

29 C.F.R. 779.206(a), *citing* S.Rep. No. 1487, 89th Cong., 2nd Sess. 7 (1966), reprinted in 1966 U.S.Code Cong. & Admin.News pp. 3002, 3009.

10. The Regulations also state that:

"Generally, the answer to the question whether particular activities are 'related' or not, will depend in each case upon whether the activities serve a business purpose common to all the activities of the enterprise, or whether they serve a separate and unrelated business purpose."

29 C.F.R. 779.206(b).

11. One of the indicia of related activities is whether there is operational interdependence, that is, whether the units sought to be treated as an enterprise provide mutually supportive services. *Wirtz v. Savannah Bank*, 362 F.2d 857, 859–60 (5th Cir. 1973); *Usery v. Mohs Realty Corp.*, 424 F.Supp. 20, 28 (W.D.Wis.1976).

12. It is evident from the facts of this case that the Club and the Lodge maintain a symbiotic relationship. The Club is open only to the Elks and their guests. The *"Membership Control Manual"* quoted above stresses the importance of the Club both in maintaining an active membership and in providing a social and fraternal atmosphere in accordance with the purposes of the organization. (See Findings of Fact Nos. 7 and 11). It is evident that without the Lodge there would be no Club. Accordingly, it is the conclusion of this Court that the Club and Lodge are "related activities".

13. "Common business purpose" is also not defined in the statute. It is, however, closely akin to the previously discussed concept of "related activities". *Usery v. Mohs Realty Corp.*, 424 F.Supp. 20, 28 (W.D.Wis.1976).

14. In *Brennan v. Plaza Shoe Store, Inc.*, 522 F.2d 843 (8th Cir. 1975), the Court quot-

ed with approval an opinion of the Wage and Hour Administration which stated that:

"[t]he courts have consistently stressed practical considerations and economic reality rather than technical concepts in the determination of coverage questions under this act  .  .  . .

.    .    .    .    .

[C]ommon ownership of 'related activities' carries considerable weight toward a determination that there is a 'common business purpose.' Generally, when a corporation is formed to carry out a particular business objective, all the activities in furtherance thereof which it may perform through unified operation or common control will, in economic reality, be related and for a common business purpose even though, in isolation, they may be quite dissimilar in kind and would, if separately performed, constitute separate business enterprises  .  .  . ." *Wirtz v. Columbian Mutual Life Insurance Co.,* 380 F.2d 903 (C.A. 6).

15. The Defendants contend that Congress did not intend to include activities such as those carried on by the Lodge and Club within the definition of common business purpose, citing the committee report accompanying the 1961 amendments, which provides:

"Eleemosynary, religious, or educational and similar activities of organizations which are not operated for a profit are not included in the term 'enterprise' as used in this bill. Such activities performed by nonprofit organizations are not activities performed for a common business purpose."

S.Rep. No. 145, 87th Cong., 1st Sess. 41 (1961), reprinted in 1961 U.S.Code Cong. & Admin.News pp. 1620, 1660.

16. This history is reflected in the regulations promulgated pursuant to the Act:

"The activities described in section 3(r) are included in an enterprise only when they are performed for a 'business' purpose. Activities of eleemosynary, religious, or educational organizations may be performed for a business purpose. Thus, where such organizations engage in ordinary commercial activities, such as operating a printing and publishing plant, the business activities will be treated under the Act the same as when they are performed by the ordinary business enterprise. (See *Mitchell v. Pilgrims Holiness Church Corp.,* 210 F.2d 879 (CA–7); cert. den. 347 U.S. 1013, [74 S.Ct. 867, 98 L.Ed. 1136].) However, the nonprofit educational, religious, and eleemosynary activities will not be included in the enterprise unless they are of the types which the last sentence of section 3(r), as amended in 1966, declares shall be deemed to be performed for a business purpose. Such activities were not regarded as performed for a business purpose under the prior Act and are not so considered under the Act as it was amended in 1966 except for those activities listed in the last sentence of amended section 3(r). (See § 779.21.)"

29 C.F.R. 779.214.

17. It is to be noted that the legislative history of the amendments makes no reference to social and fraternal activities. It is the conclusion of this Court that fraternal and social activities do not fall within the phrase "other similar activities" as used in the Senate report accompanying the 1961 amendments. Of course any activities of the Club or Lodge which are eleemosynary, religious, or educational in nature are not includable in the enterprise concept.

18. The legislative history of the 1966 amendments (which brought hospitals, nursing homes and other such establishments under the coverage of the Act) states that:

"These enterprises which are not proprietary that is, not operated for profit, are engaged in activities which are in substantial competition with similar activities carried on by enterprises organized for a business purpose. Failure to cover all activities of these enterprises will result in the failure to implement one of the basic purposes of the act, the elimination of conditions which 'constitute an unfair method of competition in commerce.' "

S.Rep. No. 1487, 89th Cong., 2nd Sess. (1966), reprinted in 1966 U.S.Code Cong. & Admin.News p. 3010. The purpose enunciated in this report further supports a finding that the Club and Lodge are engaged in a common business purpose. The Club and Lodge clearly are engaged in activities in direct competition with proprietorships in the "profit" sector.

19. It is the conclusion of this Court that the Club and the Lodge have a common business purpose.

20. The third element of the enterprise concept is unified operation and common control. Without reiterating the facts here, it is the conclusion of this Court that the findings of fact above overwhelmingly establish this element.

21. It is the conclusion of this Court that the Club and the Lodge constitute an enterprise within the meaning of section 3(r) of the Act. 29 U.S.C. § 203(r).

22. The determination of whether the Club and Lodge constitute an enterprise with the BPOE depends on the same legal criteria discussed above.

23. The report accompanying the 1961 amendments to the Act demonstrate that certain types of franchise arrangements do not constitute an enterprise within the meaning of section 3(r) of the Act, 29 U.S.C. § 203(r). The report states:

"Whether such arrangements [unified advertising, promotions, managerial advice, accounting systems, etc.] bring the establishment within the franchisor's, lessor's, or grantor's 'enterprise' is a question to be determined on all the facts. The facts may show that the arrangements reserve the necessary right of control in the grantor or unify the operations among the separate 'franchised' establishments so as to create an economic unity of related activities for a common business purpose. In that case, the 'franchised' establishment will be considered a part of the same 'enterprise'. For example, whether a franchise, lease, or other contractual arrangement between a distributor and a retail dealer has the effect of bringing

the dealer's establishment within the enterprise of the distributor will depend upon the terms of the agreements and the related facts concerning the relationship between the parties.

There may be a number of different types of arrangements established in such cases. The key in each case may be found in the answer to the question, 'who receives the profits, suffers the losses, sets the wages and working conditions of employees, or otherwise manages the business in those respects which are the common attributes of an independent businessman operating a business for profit?' "

24. The facts in this case demonstrate that the relationship between the BPOE and its lodges and their clubs is closely analogous to a franchise arrangement.

25. Using the "key" formulated by Congress in the legislative history, this Court concludes that the BPOE is not engaged in an enterprise with the Club and Lodge. The BPOE suffers no losses, makes no profits, and has no control over the day to day operation of the Club. It merely receives a "tax" on each member and sets certain standards through its constitution and bylaws.

26. The Defendants are liable for back wages for three years, inasmuch as this Court finds the violation of the Act to be wilful under 29 U.S.C. § 255. *Brennan v. Heard*, 491 F.2d 1 (5th Cir. 1974); *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139 (5th Cir. 1972).

27. This Court, however, denies Plaintiff's request for a prospective injunction against future violations of the Act. This Court finds this case similar to *Shultz v. Morris*, 315 F.Supp. 558 (M.D.Ala.1970) and adopts Chief Judge Johnson's rationale:

"Under the facts presented in this case, this Court does not find any reason for the issuance of a prospective injunction. In the first place, there was a substantial issue involving coverage and there has been, to the extent that this Court has been able to determine, on the part of the

defendants a good faith quest for legal determination of that issue. In the second place, there has been no effort on the part of the defendants to thwart the investigation or to keep or present to the Secretary anything but full and complete records. Finally, it does not appear that there is any probability of further violations. The Secretary's request for prospective injunction, therefore, will be denied."

In accordance with the foregoing, it is the ORDER, judgment and decree of this Court that the Defendants are hereby enjoined and restrained from withholding the payment of minimum wages and overtime compensation due Defendants' employees in the amount of $5,258.37, plus interest.

The Clerk is directed to send a certified copy of this Order to counsel of record.